COY *v.* IOWA

No. 86–6757.   Argued January 13, 1988—Decided June 29, 1988

SCALIA, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, in which WHITE, J., joined, *post*, p. 1022. BLACKMUN, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 1025. KENNEDY, J., took no part in the consideration or decision of the case.

*Paul Papak*, by appointment of the Court, 484 U. S. 810, argued the cause and filed briefs for appellant.

*Gordon E. Allen*, Deputy Attorney General of Iowa, argued the cause for appellee. With him on the brief were *Thomas J. Miller*, Attorney General, and *Roxann M. Ryan*, Assistant Attorney General.*

---

*John L. Walker* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut et al. by *John J. Kelly*, Chief State's Attorney of Connecticut and *John M. Massameno*, Senior Appellate Attorney, and by the Attorneys General for their respective States as follows: *John Van de Kamp* of California, *Charles M. Oberly III* of Delaware, *Linley E. Pearson* of Indiana, *Stephen E. Merrill* of New Hampshire, *Hal Stratton* of New Mexico, *David Frohnmayer* of Oregon, *T. Travis Medlock* of South Carolina, and *W. J. Michael Cody* of Tennessee; and for the State of Kentucky et al. by *David L. Armstrong*, Attorney General of Kentucky, *Penny R. Warren* and *John S. Gillig*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Don Siegelman* of Alabama, *Grace Berg Schaible* of Alaska, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *Duane Woodard* of Colorado, *Charles M. Oberly III* of Delaware, *Robert Butterworth* of Florida, *Warren Price III* of Hawaii, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Edwin L. Pittman* of Mississippi, *William L. Webster* of Missouri, *Mike Greely* of Montana, *Brian McKay* of Nevada, *W. Cary Edwards* of New Jersey, *Lacy H. Thornburg* of North Carolina, *Nicholas Spaeth* of North Dakota, *Robert Henry* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *Roger A. Tellinghuisen* of South Dakota, *W. J. Michael Cody* of Tennessee, *David L. Wilkinson* of Utah, *Jeffrey Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Godfrey R. de Castro* of the Virgin Islands, *Kenneth*

JUSTICE SCALIA delivered the opinion of the Court.

Appellant was convicted of two counts of lascivious acts with a child after a jury trial in which a screen placed between him and the two complaining witnesses blocked him from their sight. Appellant contends that this procedure, authorized by state statute, violated his Sixth Amendment right to confront the witnesses against him.

## I

In August 1985, appellant was arrested and charged with sexually assaulting two 13-year-old girls earlier that month while they were camping out in the backyard of the house next door to him. According to the girls, the assailant entered their tent after they were asleep wearing a stocking over his head, shined a flashlight in their eyes, and warned them not to look at him; neither was able to describe his face. In November 1985, at the beginning of appellant's trial, the State made a motion pursuant to a recently enacted statute, Act of May 23, 1985, § 6, 1985 Iowa Acts 338, now codified at Iowa Code § 910A.14 (1987),[1] to allow the complaining witnesses to testify either via closed-circuit television or behind a screen. See App. 4–5. The trial court approved the use of a large screen to be placed between appellant and the witness stand during the girls' testimony. After certain lighting ad-

---

O. Eikenberry of Washington, Charlie Brown of West Virginia, and Joseph B. Meyer of Wyoming.

Briefs of amici curiae were filed for the American Bar Association by Robert MacCrate; and for Judge Schudson by Charles B. Schudson, pro se, and Martha L. Minow.

[1] Section 910A.14 provides in part as follows:

"The court may require a party be confined [sic] to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony."

justments in the courtroom, the screen would enable appellant dimly to perceive the witnesses, but the witnesses to see him not at all.

Appellant objected strenuously to use of the screen, based first of all on his Sixth Amendment confrontation right. He argued that, although the device might succeed in its apparent aim of making the complaining witnesses feel less uneasy in giving their testimony, the Confrontation Clause directly addressed this issue by giving criminal defendants a right to face-to-face confrontation. He also argued that his right to due process was violated, since the procedure would make him appear guilty and thus erode the presumption of innocence. The trial court rejected both constitutional claims, though it instructed the jury to draw no inference of guilt from the screen.

The Iowa Supreme Court affirmed appellant's conviction, 397 N. W. 2d 730 (1986). It rejected appellant's confrontation argument on the ground that, since the ability to cross-examine the witnesses was not impaired by the screen, there was no violation of the Confrontation Clause. It also rejected the due process argument, on the ground that the screening procedure was not inherently prejudicial. We noted probable jurisdiction, 483 U. S. 1019 (1987).

## II

The Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him." This language "comes to us on faded parchment," *California* v. *Green,* 399 U. S. 149, 174 (1970) (Harlan, J., concurring), with a lineage that traces back to the beginnings of Western legal culture. There are indications that a right of confrontation existed under Roman law. The Roman Governor Festus, discussing the proper treatment of his prisoner, Paul, stated: "It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the

charges." Acts 25:16. It has been argued that a form of the right of confrontation was recognized in England well before the right to jury trial. Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J. Pub. L. 381, 384–387 (1959).

Most of this Court's encounters with the Confrontation Clause have involved either the admissibility of out-of-court statements, see, *e. g., Ohio* v. *Roberts,* 448 U. S. 56 (1980); *Dutton* v. *Evans,* 400 U. S. 74 (1970), or restrictions on the scope of cross-examination, *Delaware* v. *Van Arsdall,* 475 U. S. 673 (1986); *Davis* v. *Alaska,* 415 U. S. 308 (1974). Cf. *Delaware* v. *Fensterer,* 474 U. S. 15, 18–19 (1985) *(per curiam)* (noting these two categories and finding neither applicable). The reason for that is not, as the State suggests, that these elements are the essence of the Clause's protection—but rather, quite to the contrary, that there is at least some room for doubt (and hence litigation) as to the extent to which the Clause includes those elements, whereas, as Justice Harlan put it, "[s]imply as a matter of English" it confers at least "a right to meet face to face all those who appear and give evidence at trial." *California* v. *Green, supra,* at 175. Simply as a matter of Latin as well, since the word "confront" ultimately derives from the prefix "con-" (from "contra" meaning "against" or "opposed") and the noun "frons" (forehead). Shakespeare was thus describing the root meaning of confrontation when he had Richard the Second say: "Then call them to our presence—face to face, and frowning brow to brow, ourselves will hear the accuser and the accused freely speak . . . ." Richard II, Act 1, sc. 1.

We have never doubted, therefore, that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact. See *Kentucky* v. *Stincer,* 482 U. S. 730, 748, 749–750 (1987) (MARSHALL, J., dissenting). For example, in *Kirby* v. *United States,* 174 U. S. 47, 55 (1899), which concerned the admissibility of prior convictions of codefendants to prove an element of the of-

fense of receiving stolen Government property, we described the operation of the Clause as follows: "[A] fact which can be primarily established only by witnesses cannot be proved against an accused . . . except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases." Similarly, in *Dowdell* v. *United States*, 221 U. S. 325, 330 (1911), we described a provision of the Philippine Bill of Rights as substantially the same as the Sixth Amendment, and proceeded to interpret it as intended "to secure the accused the right to be tried, so far as facts provable by witnesses are concerned, by only such witnesses as meet him face to face at the trial, who give their testimony in his presence, and give to the accused an opportunity of cross-examination." More recently, we have described the "literal right to 'confront' the witness at the time of trial" as forming "the core of the values furthered by the Confrontation Clause." *California* v. *Green, supra,* at 157. Last Term, the plurality opinion in *Pennsylvania* v. *Ritchie*, 480 U. S. 39, 51 (1987), stated that "[t]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."

The Sixth Amendment's guarantee of face-to-face encounter between witness and accused serves ends related both to appearances and to reality. This opinion is embellished with references to and quotations from antiquity in part to convey that there is something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution." *Pointer* v. *Texas*, 380 U. S. 400, 404 (1965). What was true of old is no less true in modern times. President Eisenhower once described face-to-face confrontation as part of the code of his hometown of Abilene, Kansas. In Abilene, he said, it was necessary to "[m]eet anyone face to face with whom you

disagree. You could not sneak up on him from behind, or do any damage to him, without suffering the penalty of an outraged citizenry. . . . In this country, if someone dislikes you, or accuses you, he must come up in front. He cannot hide behind the shadow." Press release of remarks given to the B'nai B'rith Anti-Defamation League, November 23, 1953, quoted in Pollitt, *supra*, at 381. The phrase still persists, "Look me in the eye and say that." Given these human feelings of what is necessary for fairness,[2] the right of con-

---

[2] The dissent finds Dean Wigmore more persuasive than President Eisenhower or even William Shakespeare. *Post*, at 1029. Surely that must depend upon the proposition that they are cited for. We have cited the latter two merely to illustrate the meaning of "confrontation," and both the antiquity and currency of the human feeling that a criminal trial is not just unless one can confront his accusers. The dissent cites Wigmore for the proposition that confrontation "was not a part of the common law's view of the confrontation requirement." *Ibid.* To begin with, Wigmore said no such thing. What he said, precisely, was:

"There was never at common law any recognized right to an indispensable thing called confrontation *as distinguished from cross-examination.* There *was* a right to cross-examination as indispensable, and that right was involved in and secured by confrontation; it was the same right under different names." 5 J. Wigmore, Evidence § 1397, p. 158 (J. Chadbourn rev. 1974) (emphasis in original).

He was saying, in other words, not that the right of confrontation (as we are using the term, *i. e.*, in its natural sense) did not exist, but that its purpose was to enable cross-examination. He then continued:

"It follows that, if the accused has had the benefit of cross-examination, he has had the very privilege secured to him by the Constitution." *Ibid.*

Of course, that does not follow at all, any more than it follows that the right to a jury trial can be dispensed with so long as the accused is justly convicted and publicly known to be justly convicted—the purposes of the right to jury trial. Moreover, contrary to what the dissent asserts, Wigmore did mention (inconsistently with his thesis, it would seem), that a secondary purpose of confrontation is to produce "a certain subjective moral effect . . . upon the witness." *Id.*, § 1395, p. 153. Wigmore grudgingly acknowledged that, in what he called "earlier and more emotional periods," this effect "was supposed (more often than it now is) to be able to unstring the nerves of a false witness," *id.*, § 1395, p. 153, n. 2; but he asserted, without support, that this effect "does not arise from the confrontation of

frontation "contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails." *Lee* v. *Illinois*, 476 U. S. 530, 540 (1986).

The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." Z. Chafee, The Blessings of Liberty 35 (1956), quoted in *Jay* v. *Boyd*, 351 U. S. 345, 375–376 (1956) (Douglas, J., dissenting). It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that we have had more frequent occasion to dis-

---

the *opponent* and the witness," but from "the witness' presence before the *tribunal*," *id.*, § 1395, p. 154 (emphasis in original).

We doubt it. In any case, Wigmore was not reciting as a fact that there was no right of confrontation at common law, but was setting forth his thesis that the only essential interest preserved by the right was cross-examination—with the purpose, of course, of vindicating against constitutional attack sensible and traditional exceptions to the hearsay rule (which can be otherwise vindicated). The thesis is on its face implausible, if only because the phrase "be confronted with the witnesses against him" is an exceedingly strange way to express a guarantee of nothing more than cross-examination.

As for the dissent's contention that the importance of the confrontation right is "belied by the simple observation" that "blind witnesses [might have] testified against appellant," *post*, at 1030, that seems to us no more true than that the importance of the right to live, oral cross-examination is belied by the possibility that speech- and hearing-impaired witnesses might have testified.

cuss — the right to cross-examine the accuser; both "ensur[e] the integrity of the factfinding process." *Kentucky* v. *Stincer*, 482 U. S., at 736. The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.

## III

The remaining question is whether the right to confrontation was in fact violated in this case. The screen at issue was specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony, and the record indicates that it was successful in this objective. App. 10–11. It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter.

The State suggests that the confrontation interest at stake here was outweighed by the necessity of protecting victims of sexual abuse. It is true that we have in the past indicated that rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests. The rights referred to in those cases, however, were not the right narrowly and explicitly set forth in the Clause, but rather rights that are, or were asserted to be, reasonably implicit — namely, the right to cross-examine, see *Chambers* v. *Mississippi*, 410 U. S. 284, 295 (1973); the right to exclude out-of-court statements, see *Ohio* v. *Roberts*, 448 U. S., at 63–65; and the asserted right to face-to-face confrontation at some point in the proceedings other than the trial itself, *Kentucky* v. *Stincer*, *supra*. To hold that our determination of what

implications are reasonable must take into account other important interests is not the same as holding that we can identify exceptions, in light of other important interests, to the irreducible literal meaning of the Clause: "a right to *meet face to face* all those who appear and give evidence *at trial.*" *California* v. *Green,* 399 U. S., at 175 (Harlan, J., concurring) (emphasis added). We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed only when necessary to further an important public policy. Cf. *Ohio* v. *Roberts, supra,* at 64; *Chambers* v. *Mississippi, supra,* at 295. The State maintains that such necessity is established here by the statute, which creates a legislatively imposed presumption of trauma. Our cases suggest, however, that even as to exceptions from the normal implications of the Confrontation Clause, as opposed to its most literal application, something more than the type of generalized finding underlying such a statute is needed when the exception is not "firmly . . . rooted in our jurisprudence." *Bourjaily* v. *United States,* 483 U. S. 171, 183 (1987) (citing *Dutton* v. *Evans,* 400 U. S. 74 (1970)). The exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception.

The State also briefly suggests that any Confrontation Clause error was harmless beyond a reasonable doubt under the standard of *Chapman* v. *California,* 386 U. S. 18, 24 (1967). We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, see *e. g., Delaware* v. *Van Arsdall,* 475 U. S., at 679, 684, and see no reason why denial of face-to-face confrontation should not be treated the same. An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the

jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence. The Iowa Supreme Court had no occasion to address the harmlessness issue, since it found no constitutional violation. In the circumstances of this case, rather than decide whether the error was harmless beyond a reasonable doubt, we leave the issue for the court below.

We find it unnecessary to reach appellant's due process claim. Since his constitutional right to face-to-face confrontation was violated, we reverse the judgment of the Iowa Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, with whom JUSTICE WHITE joins, concurring.

I agree with the Court that appellant's rights under the Confrontation Clause were violated in this case. I write separately only to note my view that those rights are not absolute but rather may give way in an appropriate case to other competing interests so as to permit the use of certain procedural devices designed to shield a child witness from the trauma of courtroom testimony.

Child abuse is a problem of disturbing proportions in today's society. Just last Term, we recognized that "[c]hild abuse is one of the most difficult problems to detect and prosecute, in large part because there often are no witnesses except the victim." *Pennsylvania* v. *Ritchie,* 480 U. S. 39, 60 (1987). Once an instance of abuse is identified and prosecution undertaken, new difficulties arise. Many States have determined that a child victim may suffer trauma from exposure to the harsh atmosphere of the typical courtroom and have undertaken to shield the child through a variety of

ameliorative measures. We deal today with the constitutional ramifications of only one such measure, but we do so against a broader backdrop. Iowa appears to be the only State authorizing the type of screen used in this case. See generally App. to Brief for American Bar Association as *Amicus Curiae* 1a–9a (collecting statutes). A full half of the States, however, have authorized the use of one- or two- way closed-circuit television. Statutes sanctioning one-way systems generally permit the child to testify in a separate room in which only the judge, counsel, technicians, and in some cases the defendant, are present. The child's testimony is broadcast into the courtroom for viewing by the jury. Two-way systems permit the child witness to see the courtroom and the defendant over a video monitor. In addition to such closed-circuit television procedures, 33 States (including 19 of the 25 authorizing closed-circuit television) permit the use of videotaped testimony, which typically is taken in the defendant's presence. See generally *id.*, at 9a–18a (collecting statutes).

While I agree with the Court that the Confrontation Clause was violated in this case, I wish to make clear that nothing in today's decision necessarily dooms such efforts by state legislatures to protect child witnesses. Initially, many such procedures may raise no substantial Confrontation Clause problem since they involve testimony in the presence of the defendant. See, *e. g.*, Ala. Code § 15–25–3 (Supp. 1987) (one-way closed-circuit television; defendant must be in same room as witness); Ga. Code Ann. § 17–8–55 (Supp. 1987) (same); N. Y. Crim. Proc. Law §§ 65.00–65.30 (McKinney Supp. 1988) (two-way closed-circuit television); Cal. Penal Code Ann. § 1347 (West Supp. 1988) (same). Indeed, part of the statute involved here seems to fall into this category since in addition to authorizing a screen, Iowa Code § 910A.14 (1987) permits the use of one-way closed-circuit television with "parties" in the same room as the child witness.

Moreover, even if a particular state procedure runs afoul of the Confrontation Clause's general requirements, it may come within an exception that permits its use. There is nothing novel about the proposition that the Clause embodies a general requirement that a witness face the defendant. We have expressly said as much, as long ago as 1899, *Kirby* v. *United States*, 174 U. S. 47, 55, and as recently as last Term, *Pennsylvania* v. *Ritchie*, 480 U. S., at 51. But it is also not novel to recognize that a defendant's "right physically to face those who testify against him," *ibid.*, even if located at the "core" of the Confrontation Clause, is not absolute, and I reject any suggestion to the contrary in the Court's opinion. See *ante*, at 1020–1021. Rather, the Court has time and again stated that the Clause "reflects a *preference* for face-to-face confrontation at trial," and expressly recognized that this preference may be overcome in a particular case if close examination of "competing interests" so warrants. *Ohio* v. *Roberts*, 448 U. S. 56, 63–64 (1980) (emphasis added). See also *Chambers* v. *Mississippi*, 410 U. S. 284, 295 (1973) ("Of course, the right to confront . . . is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). That a particular procedure impacts the "irreducible literal meaning of the Clause," *ante*, at 1021, does not alter this conclusion. Indeed, virtually all of our cases approving the use of hearsay evidence have implicated the literal right to "confront" that has always been recognized as forming "the core of the values furthered by the Confrontation Clause," *California* v. *Green*, 399 U. S. 149, 157 (1970), and yet have fallen within an exception to the general requirement of face-to-face confrontation. See, *e. g.*, *Dutton* v. *Evans*, 400 U. S. 74 (1970). Indeed, we expressly recognized in *Bourjaily* v. *United States*, 483 U. S. 171 (1987), that "a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable,"

but we also acknowledged that "this Court has rejected that view as 'unintended and too extreme.'" *Id.*, at 182 (quoting *Ohio* v. *Roberts, supra,* at 63). In short, our precedents recognize a right to face-to-face confrontation at trial, but have never viewed that right as absolute. I see no reason to do so now and would recognize exceptions here as we have elsewhere.

Thus, I would permit use of a particular trial procedure that called for something other than face-to-face confrontation if that procedure was necessary to futher an important public policy. See *ante,* at 1021 (citing *Ohio* v. *Roberts, supra; Chambers* v. *Mississippi, supra*). The protection of child witnesses is, in my view and in the view of a substantial majority of the States, just such a policy. The primary focus therefore likely will be on the necessity prong. I agree with the Court that more than the type of generalized legislative finding of necessity present here is required. But if a court makes a case-specific finding of necessity, as is required by a number of state statutes, see, *e. g.,* Cal. Penal Code Ann. § 1347(d)(1) (West Supp. 1988); Fla. Stat. § 92.54(4) (1987); Mass. Gen. Laws § 278:16D(b)(1) (1986); N. J. Stat. Ann. § 2A:84A–32.4(b) (Supp. 1988), our cases suggest that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses. Because nothing in the Court's opinion conflicts with this approach and this conclusion, I join it.

JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, dissenting.

Appellant was convicted by an Iowa jury on two counts of engaging in lascivious acts with a child. Because, in my view, the procedures employed at appellant's trial did not offend either the Confrontation Clause or the Due Process Clause, I would affirm his conviction. Accordingly, I respectfully dissent.

# I

## A

The Sixth Amendment provides that a defendänt in a criminal trial "shall enjoy the right . . . to be confronted with the witnesses against him." In accordance with that language, this Court just recently has recognized once again that the essence of the right protected is the right to be shown that the accuser is real and the right to probe accuser and accusation in front of the trier of fact:

> "'The primary object of the [Confrontation Clause] was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'" *Kentucky* v. *Stincer*, 482 U. S. 703, 736–737 (1987), quoting *Mattox* v. *United States*, 156 U. S. 237, 242–243 (1895).

Two witnesses against appellant in this case were the 13-year-old girls he was accused of sexually assaulting. During their testimony, as permitted by a state statute, a one-way screening device was placed between the girls and appellant, blocking the man accused of sexually assaulting them from the girls' line of vision.[1] This procedure did not interfere

---

[1] Apparently the girls were unable to identify appellant as their attacker. Their ability to observe their attacker had been limited by the facts that it was dark, that he shined a flashlight in their eyes, and that he told them not to look at him. The attacker also appeared to be wearing a stocking over his head. Thus, the State made no effort to have the girls try to identify appellant at trial, which could not have been done, of course, without moving the screen. Neither did appellant attempt to demonstrate that the girls could not identify him. This case therefore does not present the question of the constitutionality of the restriction on cross-examination

with what this Court previously has recognized as the "purposes of confrontation." *California* v. *Green*, 399 U. S. 149, 158 (1970). Specifically, the girls' testimony was given under oath, was subject to unrestricted cross-examination, and "the jury that [was] to decide the defendant's fate [could] observe the demeanor of the witness[es] in making [their] statement[s], thus aiding the jury in assessing [their] credibility." *Ibid.* See also *Lee* v. *Illinois*, 476 U. S. 530, 540 (1986). In addition, the screen did not prevent appellant from seeing and hearing the girls and conferring with counsel during their testimony, did not prevent the girls from seeing and being seen by the judge and counsel, as well as by the jury, and did not prevent the jury from seeing the demeanor of the defendant while the girls testified. Finally, the girls were informed that appellant could see and hear them while they were on the stand.[2] Thus, appellant's *sole* complaint is the very narrow objection that the girls could not see him while they testified about the sexual assault they endured.

The Court describes appellant's interest in ensuring that the girls could see him while they testified as "the irreducible literal meaning of the Clause." *Ante*, at 1021. Whatever may be the significance of this characterization, in my view it is not borne out by logic or precedent. While I agree with the concurrence that "[t]here is nothing novel" in the proposition that the Confrontation Clause "'reflects a *preference*'" for the witness to be able to see the defendant, *ante*, at 1024, quoting *Ohio* v. *Roberts*, 448 U. S. 56, 63–64 (1980) (emphasis added in concurrence), I find it necessary to dis-

---

that would have been imposed by a refusal to allow appellant to show that the girls could not identify him.

[2] Iowa law requires that the court "inform the child that the party can see and hear the child during testimony." Iowa Code § 910A.14(1) (1987). Although the record in this case does not contain a transcript of the court's so advising the girls, the Iowa Supreme Court noted that appellant "makes no assertion [that the] trial court failed to comply with" this or other terms of the statute. 397 N. W. 2d 730, 733 (1986). Appellant concedes this point "[f]or purposes of this appeal." Brief for Appellant 5, n. 9.

cuss my disagreement with the Court as to the place of this "preference" in the constellation of rights provided by the Confrontation Clause for two reasons. First, the minimal extent of the infringement on appellant's Confrontation Clause interests is relevant in considering whether competing public policies justify the procedures employed in this case. Second, I fear that the Court's apparent fascination with the witness' ability to see the defendant will lead the States that are attempting to adopt innovations to facilitate the testimony of child victims of sex abuse to sacrifice other, more central, confrontation interests, such as the right to cross-examination or to have the trier of fact observe the testifying witness.

The weakness of the Court's support for its characterization of appellant's claim as involving "the irreducible literal meaning of the Clause" is reflected in its reliance on literature, anecdote, and dicta from opinions that a majority of this Court did not join. The majority cites only one opinion of the Court that, in my view, possibly could be understood as ascribing substantial weight to a defendant's right to ensure that witnesses against him are able to see him while they are testifying: "Our own decisions seem to have recognized at an early date that it is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." *California* v. *Green*, 399 U. S., at 157. Even that characterization, however, was immediately explained in *Green* by the quotation from *Mattox* v. *United States*, 156 U. S., at 242–243, set forth above in this opinion to the effect that the Confrontation Clause was designed to prevent the use of *ex parte* affidavits, to provide the opportunity for cross-examination, and to compel the defendant " 'to stand face to face *with the jury.*' " *California* v. *Green*, 399 U. S., at 158 (emphasis added).

Whether or not "there is something deep in human nature," *ante*, at 1017, that considers critical the ability of a witness to see the defendant while the witness is testifying,

that was not a part of the common law's view of the confrontation requirement. "There never was at common law any recognized right to an indispensable thing called confrontation *as distinguished from cross-examination*" (emphasis in original). 5 J. Wigmore, Evidence § 1397, p. 158 (J. Chadbourn rev. 1974). I find Dean Wigmore's statement infinitely more persuasive than President Eisenhower's recollection of Kansas justice, see *ante*, at 1017–1018, or the words Shakespeare placed in the mouth of his Richard II concerning the best means of ascertaining the truth, see *ante*, at 1016.[3] In fact, Wigmore considered it clear "from the beginning of the hearsay rule [in the early 1700's] to the present day" that the right of confrontation is provided "not for the idle purpose of gazing upon the witness, or *of being gazed upon by him*," but, rather, to allow for cross-examination (emphasis added). 5 Wigmore § 1395, p. 150. See also *Davis* v. *Alaska*, 415 U. S. 308, 316 (1974).

Similarly, in discussing the constitutional confrontation requirement, Wigmore notes that, in addition to cross-examination—"the essential purpose of confrontation"—there is a "secondary and dispensable element[of the right:] . . . the presence of the witness before the tribunal so that his demeanor while testifying may furnish such evidence of his credibility as can be gathered therefrom. . . . [This principle] is satisfied if the *witness*, throughout the material part of his testimony, is *before the tribunal* where his demeanor can be adequately observed." (Emphasis in original.) 5 Wigmore, § 1399, p. 199. The "right" to have the witness view the defendant did not warrant mention even as part of the "sec-

---

[3] Interestingly, the precise quotation from Richard II the majority uses to explain the "root meaning of confrontation," *ante*, at 1016, is discussed in 5 J. Wigmore, Evidence § 1395, p. 153, n. 2 (J. Chadbourn rev. 1974). That renowned and accepted authority describes the view of confrontation expressed by the words of Richard II as an "earlier conception, still current in [Shakespeare's] day" which, by the time the Bill of Rights was ratified, had merged "with the principle of cross-examination." *Ibid.*

ondary and dispensable" part of the Confrontation Clause protection.

That the ability of a witness to see the defendant while the witness is testifying does not constitute an essential part of the protections afforded by the Confrontation Clause is also demonstrated by the exceptions to the rule against hearsay, which allow the admission of out-of-court statements against a defendant. For example, in *Dutton* v. *Evans*, 400 U. S. 74 (1970), the Court held that the admission of an out-of-court statement of a co-conspirator did not violate the Confrontation Clause. In reaching that conclusion, the Court did not consider even worthy of mention the fact that the declarant could not see the defendant at the time he made his accusatory statement. Instead, the plurality opinion concentrated on the reliability of the statement and the effect cross-examination might have had. See *id.*, at 88–89. See also *Mattox* v. *United States*, 146 U. S. 140, 151–152 (1892) (dying declarations admissible). In fact, many hearsay statements are made outside the presence of the defendant, and thus implicate the confrontation right asserted here. Yet, as the majority seems to recognize, *ante*, at 1016, this interest has not been the focus of this Court's decisions considering the admissibility of such statements. See, *e. g., California* v. *Green*, 399 U. S., at 158.

Finally, the importance of this interest to the Confrontation Clause is belied by the simple observation that, had blind witnesses testified against appellant, he could raise no serious objection to their testimony, notwithstanding the identity of that restriction on confrontation and the one here presented.[4]

---

[4] The Court answers that this is "no more true than that the importance of the right to live, oral cross-examination is belied by the possibility that speech- and hearing-impaired witnesses might have testified." *Ante*, at 1019, n. 2. The Court's comparison obviously is flawed. To begin with, a deaf or mute witness who was physically incapable of being cross-examined presumably also would be unable to offer any direct testimony. More im-

## B

While I therefore strongly disagree with the Court's insinuation, *ante*, at 1016, 1019–1020, that the Confrontation Clause difficulties presented by this case are more severe than others this Court has examined, I do find that the use of the screening device at issue here implicates "a preference for face-to-face confrontation at trial," embodied in the Confrontation Clause. *Ohio* v. *Roberts*, 448 U. S., at 63. This "preference," however, like all Confrontation Clause rights, "'must occasionally give way to considerations of public policy and the necessities of the case.'" *Id.*, at 64, quoting *Mattox* v. *United States*, 156 U. S., at 243. See also *Chambers* v. *Mississippi*, 410 U. S. 284, 295 (1973). The limited departure in this case from the type of "confrontation" that would normally be afforded at a criminal trial therefore is proper if it is justified by a sufficiently significant state interest.

Indisputably, the state interests behind the Iowa statute are of considerable importance. Between 1976 and 1985, the number of reported incidents of child maltreatment in the United States rose from 0.67 million to over 1.9 million, with an estimated 11.7 percent of those cases in 1985 involving allegations of sexual abuse. See American Association for Protecting Children, Highlights of Official Child Neglect and Abuse Reporting 1985, pp. 3, 18 (1987). The prosecution of these child sex-abuse cases poses substantial difficulties because of the emotional trauma frequently suffered by child witnesses who must testify about the sexual assaults they have suffered. "[T]o a child who does not understand the reason for confrontation, the anticipation and experience of being in close proximity to the defendant can be overwhelm-

---

portantly, if a deaf or mute witness were completely incapable of being cross-examined (as blind witnesses are completely incapable of seeing a defendant about whom they testify), I should think a successful Confrontation Clause challenge might be brought against whatever direct testimony they did offer.

ing." D. Whitcomb, E. Shapiro, & L. Stellwagen, When the Victim is a Child: Issues for Judges and Prosecutors 17–18 (1985). Although research in this area is still in its early stages, studies of children who have testified in court indicate that such testimony is "associated with increased behavioural disturbance in children." G. Goodman et al., The Emotional Effects of Criminal Court Testimony on Child Sexual Assault Victims, in The Child Witness: Do the Courts Abuse Children?, Issues in Criminological and Legal Psychology, No. 13, pp. 46, 52 (British Psychological Society 1988). See also Avery, The Child Abuse Witness: Potential for Secondary Victimization, 7 Crim. Just. J. 1, 3–4 (1983); S. Sgroi, Handbook of Clinical Intervention in Child Sexual Abuse 133–134 (1982).

Thus, the fear and trauma associated with a child's testimony in front of the defendant have two serious identifiable consequences: They may cause psychological injury to the child, and they may so overwhelm the child as to prevent the possibility of effective testimony, thereby undermining the truth-finding function of the trial itself.[5] Because of these effects, I agree with the concurring opinion, *ante*, at 1025, that a State properly may consider the protection of child witnesses to be an important public policy. In my view, this important public policy, embodied in the Iowa statute that authorized the use of the screening device, outweighs the narrow Confrontation Clause right at issue here—the "preference" for having the defendant within the witness' sight while the witness testifies.

Appellant argues, and the Court concludes, *ante*, at 1021, that even if a societal interest can justify a restriction on a

---

[5] Indeed, some experts and commentators have concluded that the reliability of the testimony of child sex-abuse victims actually is enhanced by the use of protective procedures. See *State* v. *Sheppard*, 197 N. J. Super. 411, 416, 484 A. 2d 1330, 1332 (1984); Note, Parent-Child Incest: Proof at Trial Without Testimony in Court by the Victim, 15 U. Mich. J. L. Ref. 131 (1981).

child witness' ability to see the defendant while the child testifies, the State must show in each case that such a procedure is essential to protect the child's welfare. I disagree. As the many rules allowing the admission of out-of-court statements demonstrate, legislative exceptions to the Confrontation Clause of general applicability are commonplace.[6] I would not impose a different rule here by requiring the State to make a predicate showing in each case.

In concluding that the legislature may not allow a court to authorize the procedure used in this case when a 13-year-old victim of sexual abuse testifies, without first making a specific finding of necessity, the Court relies on the fact that the Iowa procedure is not "'firmly . . . rooted in our jurisprudence.'" *Ante*, at 1021, quoting *Bourjaily* v. *United States*, 483 U. S. 171, 183 (1987). Reliance on the cases employing that rationale is misplaced. The requirement that an exception to the Confrontation Clause be firmly rooted in our jurisprudence has been imposed only when the prosecution seeks to introduce an out-of-court statement, and there is a question as to the statement's *reliability*. In these circumstances, we have held: "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ohio* v. *Roberts*, 448 U. S., at 66. See also *Bourjaily* v. *United States*, 483 U. S., at 182–183. Clearly, no such case-by-case inquiry into reliability is needed here. Because the girls testified under oath, in full view of the jury, and were subjected to unrestricted cross-

---

[6] For example, statements of a co-conspirator, excited utterances, and business records are all generally admissible under the Federal Rules of Evidence without case-specific inquiry into the applicability of the rationale supporting the rule that allows their admission. See Fed. Rules Evid. 801(d)(2), 803(2), 803(6). As to the first of these, and the propriety of their admission under the Confrontation Clause without any special showing, see *United States* v. *Inadi*, 475 U. S. 387 (1986), and *Bourjaily* v. *United States*, 483 U. S. 171, 181–184 (1987).

examination, there can be no argument that their testimony lacked sufficient indicia of reliability.

For these reasons, I do not believe that the procedures used in this case violated appellant's rights under the Confrontation Clause.

## II

Appellant also argues that the use of the screening device was "inherently prejudicial" and therefore violated his right to due process of law. The Court does not reach this question, and my discussion of the issue will be correspondingly brief.

Questions of inherent prejudice arise when it is contended that "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes* v. *Texas*, 381 U. S. 532, 542–543 (1965). When a courtroom arrangement is challenged as inherently prejudicial, the first question is whether "an unacceptable risk is presented of impermissible factors coming into play," which might erode the presumption of innocence. *Estelle* v. *Williams*, 425 U. S. 501, 505 (1976). If a procedure is found to be inherently prejudicial, a guilty verdict will not be upheld if the procedure was not necessary to further an essential state interest. *Holbrook* v. *Flynn*, 475 U. S. 560, 568–569 (1986).

During the girls' testimony, the screening device was placed in front of the defendant. In order for the device to function properly, it was necessary to dim the normal courtroom lights and focus a panel of bright lights directly on the screen, creating, in the trial judge's words, "sort of a dramatic emphasis" and a potentially "eerie" effect. App. 11, 14. Appellant argues that the use of the device was inherently prejudicial because it indicated to the jury that appellant was guilty. I am unpersuaded by this argument.

Unlike clothing the defendant in prison garb, *Estelle* v. *Williams*, *supra*, or having the defendant shackled and gagged, *Illinois* v. *Allen*, 397 U. S. 337, 344 (1970), using

the screening device did not "brand [appellant] . . . 'with an unmistakable mark of guilt.'"  See *Holbrook* v. *Flynn*, 475 U. S. at 571, quoting *Estelle* v. *Williams*, 425 U. S., at 518 (BRENNAN, J., dissenting).  A screen is not the sort of trapping that generally is associated with those who have been convicted.  It is therefore unlikely that the use of the screen had a subconscious effect on the jury's attitude toward appellant.  See 475 U. S., at 570.

. In addition, the trial court instructed the jury to draw no inference from the device:

> "It's quite obvious to the jury that there's a screen device in the courtroom.  The General Assembly of Iowa
> . recently passed a law which provides for this sort of procedure in cases involving children.  Now, I would caution you now and I will caution you later that you are to draw no inference of any kind from the presence of that screen.  You know, in the plainest of language, that is not evidence of the defendant's guilt, and it shouldn't be in your mind as an inference as to any guilt on his part.  It's very important that you do that intellectual thing."  App. 17.

Given this helpful instruction, I doubt that the jury—which we must assume to have been intelligent and capable of following instructions—drew an improper inference from the screen, and I do not see that its use was inherently prejudicial.  After all, "every practice tending to single out the accused from everyone else in the courtroom [need not] be struck down."  *Holbrook* v. *Flynn*, 475 U. S., at 567 (placement throughout trial of four uniformed state troopers in first row of spectators' section, behind defendant, not inherently prejudicial).

I would affirm the judgment of conviction.