576 A.2d 1005

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Edward DAVIS, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 15, 1990.

Filed June 13, 1990.

---

Daniel M. Preminger, Philadelphia, for appellant.

Marianne E. Cox, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

594

Before CAVANAUGH, OLSZEWSKI and FORD ELLIOTT, JJ.

CAVANAUGH, Judge:

This is an appeal from judgment of sentence entered in the Court of Common Pleas of Philadelphia County. The appellant was found guilty of first degree murder, possessing an instrument of crime, four counts of simple assault and two counts of kidnapping.[1] The appellant asserts that he is entitled to a new trial because: 1) the lower court abused its discretion in ruling that D.F., a child witness, was competent to testify; 2) that appellant's right of confrontation was violated when the lower court erroneously permitted D.F. to testify at trial via closed circuit television; and 3) that the lower court committed reversible error by admitting evidence of other crimes. We disagree and accordingly, affirm the judgment of sentence.

The record reveals the following facts. In the early morning of April 27, 1987 the appellant went to the apartment of Renell F., the victim, knocked on the door and was admitted by her. He then directed the victim, his estranged girlfriend and the mother of two of his children, to remove her clothes. After the victim complied, she and the appellant went into the bedroom where, a short time later, the appellant shot Renell F. once in the face and twice in the back of the head, causing her death.

Approximately seven weeks prior to the shooting of Renell F. on March 8, 1987, the appellant, who had been searching for her,[2] forced his way at gunpoint into the car of Anthony Dates, an acquaintance of the victim. The appellant then forced Mr. Dates to drive to the home of Frances Saunders in Philadelphia. Mr. Dates and his wife,

1. The appellant was sentenced to life imprisonment on the murder charge, and an aggregate sentence of twenty-five years to fifty years on the remaining offenses which run concurrently with the sentence imposed on the murder conviction.

2. The record reveals that the murder victim had temporarily relocated several times and had obtained a protection from abuse order enjoining appellant from entering her apartment building in an effort to keep the appellant away from her.

Sharon Saunders, had previously given the victim sanctuary in their Wilkes–Barre, Pennsylvania home during the victim's futile effort to keep appellant away from her. Once inside the residence, the appellant threw Frances Saunders (Sharon Saunders' mother and also a friend of Renell F.) to the floor, pointed the gun at her and demanded to know where the victim was living. Subsequently, he pointed the gun at Sharon Saunders, forced her to leave the house at gunpoint, and while walking down the street, still holding Sharon Saunders hostage, he was confronted by a police officer. The officer called for assistance and eventually placed the appellant under arrest. It was while appellant was on bail for the above assault and kidnapping offenses that he shot and killed the victim.

The case was tried without a jury from October 24–28, 1988. Trial counsel, who filed post-verdict and post-sentence motions, was then permitted to withdraw and new counsel was retained by the appellant. New counsel filed supplemental motions and all motions were heard and denied by the lower court on April 27, 1989. This appeal follows.

 Appellant first maintains that the trial court abused its discretion in finding that D.F., the daughter of the appellant and the victim, was competent to testify. The child, who was the only witness to the actual murder, was five years old at the time of her mother's death and six years old at the time of trial. When evaluating the competency of children to testify, we are guided by the following principles:

A witness is presumed competent to testify unless proven otherwise. When a proposed witness is under fourteen years of age, however, there must be a searching judicial inquiry as to mental capacity. This inquiry will probe the capacity to communicate, observe and remember, and a consciousness of the duty to speak the truth in proportion to the witness's chronological immaturity. [T]he judge holds the superior opportunity to evaluate the competency of a proposed child witness. . . .

*Commonwealth v. McEachin,* 371 Pa.Super. 188, 537 A.2d 883 (1988) (*allocatur* denied), quoting *Commonwealth v. Stohr,* 361 Pa.Super. 293, 522 A.2d 589 (1987), (citations omitted).

Our Supreme Court has mandated that in evaluating competency, the trial court must be satisfied that the witness has:

"(1) such capacity to communicate, including as it does both an ability to understand questions and to frame express and intelligent answers; (2) mental capacity to observe the occurrence itself and the capacity of remembering *what it is* that [the witness] is called to testify about; and (3) a consciousness of the duty to speak the truth."

*Rosche v. McCoy,* 397 Pa. 615, 620, 156 A.2d 307, 310 (1959) (emphasis in original), quoted in *Commonwealth v. Hart,* 501 Pa. 174, 177, 460 A.2d 745, 747 (1983).

■ Determination of competency will not be disturbed on appeal absent a clear abuse of discretion. *Commonwealth v. McEachin, supra.*

Instantly, appellant concedes that D.F. demonstrated an understanding of the duty to speak the truth and an ability to understand questions and frame intelligent answers. However, appellant contends that the child did not demonstrate either the capacity to observe or perceive the occurrence with a substantial degree of accuracy or the ability to remember the events which were observed or perceived, or an ability to communicate intelligent answers about the occurrence.

A survey of D.F.'s direct testimony at trial rebuts the appellant's allegations:

[BY THE ASSISTANT DISTRICT ATTORNEY]:

Q. Do you remember when you told us what happened that night?

A. Yeah.

Q. Who came to the door?

A. My father.

Q. What did your father do when he came to the door?

A. He just came in.

Q. Who let him in?

A. My mom.

\* \* \* \* \* \*

Q. After your mother opened the door, what did she say or what did your father say?

A. She did not say nothing.

Q. I'm sorry?

A. She didn't say nothing.

Q. What did he say?

A. Nothing.

Q. What happened after that?

A. Tell her to go in the bathroom.

Q. And after that, tell us what happened.

A. Told her to take her clothes off.

Q. He told her to take her clothes off?

A. Yeah.

Q. Did she do that?

A. Yeah.

Q. What happened after that?

A. She came back out.

Q. Was she wearing anything?

A. No.

Q. What happened after that?

A. I was peaking [sic] through the door.

Q. You were peaking through the door of what?

A. To see that was gonna happen.

Q. What did happen?

A. She went in the room and when I went in there, she was on the mattress, and then she had blood all over her.

Q. How did she get blood on her?

A. Because he shot her.

Q. How many shots did you hear?

A. I don't know. Two or five.

Q. Can you show us on your fingers how many shots you heard?

A. First I said five and then I said two (indicating).

Q. Do you remember now how many it was?

A. Two.

Q. Were you looking at that time through the door?

A. No.

Q. After your heard the two shots, where did your daddy go?

A. When I went in there, he was gone.

Q. Did you see anything in his hand?

A. Unh-unh, but I know he had a gun.

Q. How do you know he had a gun?

A. Because sometimes I see it.

Q. How long was that gun; do you know?

A. No. I think it's medium though.

 * * * * * *

Q. After daddy shot mommy, what did you do?

A. I came in the room and looked at her and I start crying, and then I told Miss White.

Q. What did you tell Miss White?

A. That my mom was there, and then the other girl came of the other hallway and then she thought I was knocking on her door and then she came and looked what happened.

 * * * * * *

Q. What did you tell Miss White as to who did it?

A. I said she was dead.

Q. Did you tell Miss White who killed mommy?

A. No, but it was my daddy for real.

Q. Did anyone tell you to say that or are you saying that because it was the truth?

A. It was the truth.

The above colloquy between the assistant district attorney and D.F. on direct testimony unambiguously demonstrates that the child both recalled the murder and was able

to intelligently recount what she saw and heard. Furthermore, our review of the record shows that during the lengthy cross-examination, the basic tenets of the child's testimony remained unchanged.

 ■ The appellant also claims that D.F. was incompetent on the theory that her testimony was fraught with inconsistencies, and that she was easily manipulated during questioning into giving yes or no answers to leading questions. While there were some minor inconsistencies during D.F.'s testimony, the child consistently maintained that it was the appellant who came to the apartment the night of the murder. We agree with the Commonwealth's argument that if mere inconsistencies were a sufficient basis for declaring a witness incompetent, few adult witnesses, much less child witnesses, would ever effectively testify in our courts. Furthermore, minor inconsistencies in testimony are not in themselves sufficient bases to find a child witness incompetent. *Commonwealth v. McEachin, supra.* In *McEachin, supra,* this court held that the trial court did not abuse its discretion in finding a child witness competent, notwithstanding that the witness occasionally gave inconsistent answers and answers that "could not possibly be correct". Like D.F.'s testimony, the child's testimony in *McEachin* on the whole demonstrated a concept of truth, understanding of questions, and the honesty to give intelligent and relevant answers.[3]

Finally, the trial court, who sat as fact finder and had the opportunity to evaluate the child, aptly rejected all of appellant's challenges to D.F.'s competency:

[3] The appellant's reliance in this matter upon *Commonwealth v. Mazzoccoli,* 475 Pa. 408, 380 A.2d 786 (1977) is misplaced. There the fifteen-year-old witness, who apparently suffered a mental disability, said that he was in the eleventh grade at a school that only went up to the eighth grade. He testified that it was right to tell a lie, and that he did not know what would happen if he lied on the witness stand. The witness' testimony demonstrated that he did not understand the questions posed and could not respond with intelligent answers. The witness also inconsistently answered yes or no to the same questions. 380 A.2d at 787–788.

The court's observation of the witness' demeanor indicates that she was above-average intelligence and possessed the ability to remember what had happened to her mother. Although she sometimes gave inconsistent answers, the witness demonstrated that she understood the questions, observed and remembered what had happened the night of the shooting, was not easily manipulated and could give relevant and intelligent answers to the questions put to her by counsel. Most important, despite defense counsel's thorough cross-examination, the witness consistently maintained that it was her father who came to the apartment the night of the murder and that she saw him by peeking through a partially open door. It is clear, therefore, that this child was competent to testify and the defendant is not entitled to a new trial on this basis.

(Opinion, Savitt, J. at 5–6).

On the basis of the trial court's observation and our review of the record, we find no abuse of discretion and accordingly, appellant is not entitled to relief on this issue.

Appellant's second contention is that his constitutional right to confrontation [4] was violated when the lower

4. Article 1 section 9 of the state constitution provides:
 In all criminal prosecutions the accused has a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment of information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land.
 The sixth amendment to Article 7 of the federal constitution provides:
 In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation: to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

court permitted D.F. to testify at trial via two-way closed circuit television. When it became apparent to the lower court that the child was unable to answer substantive questions in the presence of appellant, the child, accompanied by her grandmother and the child advocate appointed by the lower court, entered a room adjacent to the courtroom where the witness was able to view on a color monitor the trial court, defense counsel, and the prosecutor while they were posing questions. Another color monitor similarly transmitted the child's testimony into the courtroom. The appellant relies on the Supreme Court's holding *in Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) for the proposition that his confrontational rights were violated by the procedure followed by the lower court. We agree with the lower court that appellant's reliance on *Coy v. Iowa, supra,* is misplaced.

The Sixth Amendment to the United States Constitution provides that a criminal defendant shall enjoy the right "to be confronted with the witnesses against him." *Commonwealth v. Groff,* 378 Pa.Super. 353, 548 A.2d 1237. In *Commonwealth v. Gross, supra,* Beck, J. accurately summarized the Supreme Court's confrontation clause analysis in *Coy:*

> In *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the United States Supreme Court recently emphasized that under this clause the defendant has the right to face his accusers. The defendant in *Coy* was tried on charges of sexually molesting two 13 year old girls. At trial, the judge, acting pursuant to an Iowa statute, erected a one-way screen in the courtroom which allowed the defendant to view the girls but which prevented the girls from viewing the defendant. The Court ruled that the federal constitution did not permit the use of a physical barrier to shield witnesses from the defendant's gaze—*at least in the absence of an individualized finding that the particular juveniles, who testified required special protection. See* 487 U.S. at 1022, 108 S.Ct. at 2803 (majority opinion) and 487 U.S. at 1023, 108 S.Ct. at 2804–05 (O'Connor, J., concurring).

On the other hand, the Court in *Coy* cautioned that: "The Confrontation Clause does not, of course, compel the witness to fix his eyes on the defendant; he may studiously look elsewhere but the trier of fact will draw its own conclusions." 487 U.S. at 1019, 108 S.Ct. at 2802. *Commonwealth v. Groff*, 378 Pa.Super. at 377, 548 A.2d at 1249 (emphasis added.)[5]

Unlike the court in *Coy*, where the Iowa court invoked a statutory presumption of trauma as its basis for the use of a screen, the lower court in this case indeed made an individualized finding that D.F. was entitled to special protection:

First, an individualized finding was made only after counsel was appointed for the child, the child was examined by an independent psychologist and extensive hearings had been held concerning her ability to testify. Second, the decision rests not only on a finding that the child would be traumatized by testifying in the presence of her father, but also on a finding that she would suffer such emotional stress as to be *unable* to reasonably communicate about what happened the night of the offense, a finding which is tantamount to a finding that the witness is unavailable.

(Opinion of Savitt, J. at pg. 7.) (Emphasis in original.)

The record before us clearly supports the lower court's decision that there was an individualized finding of necessity for D.F. to testify via closed circuit television. The record reveals that after her mother's murder, the then five-year old eyewitness entered psychiatric therapy. The child was so traumatized by witnessing the murder that she was afraid to go outside to play with friends and could not even bear to be alone in a room; she followed her maternal grandmother, Mrs. Sumpter, wherever she went. The child awoke crying at night. She was so overwhelmed with anxiety that she not only was very quiet and tense, but Dr. Viola, her examining psychiatrist, noted that she literally

---

5. We also note that the Supreme Court in *Coy* did not specifically strike down the portion of the Iowa statute which allowed for the use of closed circuit television in the same manner as the present case.

rolled herself up into a ball, "a kind of physical drawing into herself with fear."

However, the child began to make some progress in her emotional healing after living with her maternal grandmother and receiving psychiatric care. The psychologist found that she had been able to build up mental barriers that kept the worst memories away. A hearing was held on September 28, 1988, at the Commonwealth's request, to determine whether any alternate procedure could be utilized at trial to minimize further psychological trauma to the child. The trial court appointed Dr. Breslin, an independent psychologist, to examine the child.

Dr. Breslin's report, and the testimony presented by the child's grandmother and Dr. Viola, established that the child was terrified of appellant and knew that other adults in her life were also afraid of him. Although the child had made significant progress in her emotional recovery in the eighteen months since her mother's murder, appellant's upcoming trial had caused the child severe regression and crushing anxiety. It was expected that the child would experience even greater emotional difficulty as the time for trial approached. Dr. Viola, the psychiatrist, testified that although the courtroom setting itself was likely to be intimidating to the child, the real threatening factor to the child was the presence of appellant in the same room. The doctor opined that even if the child were not asked to testify, but were merely put in the same setting as defendant, the experience would cause impairment in the young child's functioning and cause long-term anxiety.

Dr. Viola also opined that forcing the child to testify about her mother's murder in the presence of the perpetrator would cause the young girl to relive the terrifying incident, and that asking her to do so in such a frightening setting would cause serious long-term emotional harm. While Dr. Viola found that testifying under any circumstances would be very traumatic for the child, and not in her best interest, testifying out of defendant's presence would minimize the trauma. Dr. Viola also found that the child was so terrified of the situation that she sometimes

became virtually mute, and that she might not be capable of communicating about the incident in a stressful courtroom setting.

Similarly, Dr. Breslin, the court appointed psychologist, found that as a result of witnessing her mother's murder, the child had very little faith in herself, gave up readily, and suffered from overwhelming insecurity. He found that D.F. was unable to deal with tension arousing situations and was incapable of thinking under stress, which tended to cause her to withdraw. During psychological testing, the child was unable to deal with the very thought of appellant, her father, and although she had difficulty dealing with thoughts of her mother, she still had some acceptable memories of her. Testing also revealed that the child was very apprehensive, and was fearful that she was being watched; and that her memories of her home were very tension arousing.

Dr. Breslin further opined that the child's prior psychiatric therapy was of limited help, due to her young age, and would not help her withstand the anxiety of testifying. The doctor felt that her mother's murder would have lifelong effects upon the little girl, and that it was in her best interests not to testify about the incident.

After consideration of all of the evidence, the trial court found that, although the child was likely to suffer emotional impairment, this factor alone was an insufficient basis upon which to permit the child to testify by way of closed circuit monitors. The trial court did rule that the child's grandmother and the court-appointed child advocate, with whom the child had a good rapport, could remain near the child during her testimony.

However, when D.F. was called to testify at trial, she was able to answer questions concerning competency but became virtually mute towards any questions pertaining to the murder of her mother. The trial court repeatedly postponed her testimony, ordering several recesses, so that the child could take long walks with the child advocate in an effort to reassure her. The child did testify, however, that

she told the truth at the preliminary hearing,[6] and that she did not want to answer any questions, and did not want to "see her daddy."

Based upon his observation of the child's demeanor and her inability to answer substantive questions in defendant's presence, the trial court then ruled that he would view her testimony by way of two-way monitor. After the child was situated in the adjacent room, further competency questions were posed and answered, and the child then related the substance of her testimony.

On the basis of the expert testimony presented and the inability of D.F. to answer substantive questions in her father's presence, our review of the record leads us to conclude that the lower court did make an individualized finding of a special need, and the use of closed circuit television was warranted in this particular case.

As to appellant's final issue, the appellant claims that the lower court erred in admitting certain testimony: First, that Renell F. had left Philadelphia to stay with friends in Wilkes–Barre because of her fear of appellant; second, that shortly before the murder, the victim told a friend that appellant destroyed her apartment with an axe; and third, that the victim told a neighbor she was afraid that appellant would hurt her.

█ We agree with the lower court that the above evidence was relevant. "Evidence is relevant if it tends to make more or less probable the existence of some fact material to the case, it tends to establish facts in issue or when to some degree advances the inquiry and thus has probative value." *Commonwealth v. Shain*, 324 Pa.Super. 456, 471 A.2d 1246 (1984). Furthermore, the admission or exclusion of evidence is a matter committed to the sound discretion of the trial judge. *Commonwealth v. Cargo*, 498 Pa. 5, 444 A.2d 639 (1982).

█ It is clear that the evidence under consideration was relevant. First, we agree with the lower court that

6. D.F. also testified via closed circuit television at appellant's preliminary hearing on May 6, 1987.

evidence of Renell F.s' reasons for moving to Wilkes–Barre was relevant to show the nature of the relationship between appellant and the deceased. Second, the evidence that appellant had "axed" Ms. F.'s apartment was relevant to show appellant's hostility towards her.[7] Furthermore, this evidence was elicited by appellant's counsel on cross-examination and the trial court did not permit further testimony concerning the specifics of the matter. Finally, the decedent's statement that she was afraid that appellant would harm her was part and parcel of the chain of events leading up to the murder and thus, was fully admissible. *See Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988).

However, even relevant evidence "is inadmissible if the trial court, in its discretion, determines that its prejudicial impact outweighs its probative value. *Commonwealth v. Costal*, 351 Pa.Super. 200, 505 A.2d 337 (1986). The appellant contends that he was seriously prejudiced by the admission of the above evidence.

It would be difficult to conceive of a trial at which the prosecution's evidence was not prejudicial to the defendant. *Commonwealth v. Moore*, 389 Pa.Super. 473, 567 A.2d 701 (1989). "The difficulty arises when the evidence is so prejudicial that it sweeps the [fact finder] beyond a rational consideration of guilt or innocence of the crime on trial." *Commonwealth v. Moore*, 389 Pa.Super. at 483, 567 A.2d at 706. Our thorough review of the entire record leads us to conclude that the evidence in dispute was not of the type described above and was properly admitted.

Judgment of sentence affirmed.

---

7. We do not agree with appellant that this statement is inadmissible as hearsay. The decedent made this statement to witness Earl Maples. Mr. Maples testified that the incident occurred while he was in his neighboring apartment, and the decedent came running across the street to his apartment and told him about it. The record reveals that this statement clearly qualifies under the excited utterance exception to the hearsay rule. *See, Commonwealth v. Ehrsam*, 355 Pa.Super. 40, 512 A.2d 1199 (1986).