Abram Isaac PEEBLES *v.* STATE of Arkansas

CR 90-276                                      808 S.W.2d 331

Supreme Court of Arkansas
Opinion delivered April 29, 1991

*Harold W. Madden,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Clint Miller,* Sr. Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant, Abram Isaac Peebles, was convicted of rape of his three-year-old nephew (the boy) and sentenced to 40 years confinement. He raises these points on appeal: (1) the evidence was insufficient to support the conviction; (2) the court erred in allowing Peebles' sister, who is the mother (the mother) of the boy to give hearsay testimony pursuant to A.R.E. 803(25); (3) the court erred in admitting as expert testimony the statement of a physician who examined the boy; and (4) the court erred in allowing the prosecutor to question Peebles' mother (the grandmother) about irrelevant pornographic materials found in his home. We find the evidence sufficient to support the conviction. We decline to reverse the trial court's determination, made in consideration of the factors stated in Rule 803(25), that the boy's statement to the mother was sufficiently reliable to allow the mother's testimony. We hold that the physician was qualified as an expert and that, to the extent the prosecutor was erroneously allowed to question the grandmother about the pornographic matter it was not sufficiently prejudicial to require reversal.

The Circuit Court held a hearing to determine whether to

admit the mother's testimony as to what the boy had told her with respect to the alleged rape. The boy was brought before the Court, and after stating his name and that he was four years old, he became completely inarticulate. He answered questions about his family in an obviously incorrect manner and was unable even to identify Peebles. He denied that he had told his mother about anything that Peebles had done to him.

The mother testified that she, the grandmother, an aunt of the boy, and Peebles lived in separate trailer homes in the same trailer park. The mother testified she took the boy to Peebles' home to watch television. She testified that when she returned for her child she struck a glass window on Peebles' trailer with her arm. Peebles said, "Wait a minute. I'm fixing to take a bath." The boy drew back a sheet covering the glass door, and she could see Peebles, naked with an erection, pulling up the boy's pants. When she entered the trailer, Peebles told her he had done nothing wrong. She took the boy by the hand and left. She felt something "slimy" in the boy's left hand, so she took his other hand.

The mother testified that when she got him home, she put the boy on the bed and asked him what had happened. He said "No mommy, you'll whip me." She assured him she would not and asked "What did Uncle Abram do to you?" He replied, "He bite my dingdong." In response to further questions, the boy told the mother that Peebles began bouncing on the bed and "we fight dingdongs." He also told her "I had some milk from his dingdong." She called the police. She testified that when her husband arrived at home, the boy ran up to him and said, "Daddy, Uncle Abram bite my dingdong."

On cross-examination, the mother testified that she had been in counseling, had been taking antidepressants, and that she sometimes did and sometimes did not get along with Peebles.

The grandmother testified at the hearing that she came to the trailer park sometime after the event but while the police cruiser was there. She found the mother standing by the police car laughing. She stopped laughing as the grandmother approached.

The boy was brought to the grandmother, and she asked him if Peebles bit him. He replied "Uh huh, Meemaw." She then asked him to show her where, and he pointed to a spot on his penis

where, she said, he had been bitten by a tick four days earlier. He again responded affirmatively when she asked if he were sure that was where Peebles had bitten him. The grandmother testified that Peebles and the mother often fought and that the mother had previously suffered brain damage from a coma and would have to be in counseling for the rest of her life. She also related that the mother had made false sexual accusations against her father and grandfather, and that the allegations had caused such a stir in the trailer park that the grandmother, who was in charge of the park, had had to ask the mother to move away.

The aunt testified that on the day of the incident she heard the mother banging on Peebles' door and asking to be let in. She shut her window because, "they're constantly fighting." Fifteen minutes later, the mother came to her and told her what had happened. The aunt went to the boy and asked him what had happened at Peebles' trailer, and he said "We hit wingdings together" and "I wanted some milk. Uncle Abram got me some milk."

The mother testified that, at the request of the police, the boy was taken to Arkansas Children's Hospital. He was examined there by Dr. Jim Mark Ingram. Dr. Ingram testified at the hearing that he had found a film around the boy's mouth, down his chin, down his abdomen and on his left hand. He used an ultraviolet Wood's lamp which causes sperm to floresce with positive result. On cross-examination he admitted that lots of substances would floresce under the lamp.

At the conclusion of the hearing, the Court stated that the stories of the mother, the grandmother, and the aunt were consistent, and there was sufficient evidence for the doctor to give his opinion. The Court ruled the testimony admissible.

### 1. Sufficiency of the evidence

Peebles was charged with rape in violation of Ark. Code Ann. § 5-14-103 (1987) which provides, in relevant part, "(a) A person commits rape if he engages in . . . deviate sexual activity with another person: . . . (3) Who is less than fourteen (14) years of age. . . ." "Deviate sexual activity" is defined in Ark. Code Ann. § 5-14-101 (1987), in relevant part, as "any act of sexual gratification involving: (A) The penetration, however slight, of

the . . . mouth of one person by the penis of another person. . . ."

At the trial, the State's evidence consisted of the mother's testimony and that of Dr. Ingram. They each testified in virtually the same language used at the pre-trial hearing and to the same facts.

The defense presented the testimony of a serologist from the State Crime Laboratory who testified that he examined the "rape kit" consisting of samples of body fluids, hair, etc., taken from the boy at the hospital and was unable to detect any semen.

The defense also presented testimony of the aunt who said that when she had asked the boy what had happened the boy told her he had been at Peebles' trailer, had wanted some milk, and that Peebles brought it to him. She testified that Peebles had stopped by her place on the way to the store and asked if she needed anything. When he came back, he had the soft drink she had requested, and when asked, told her the contents of the sack he was carrying were vanilla wafers and milk for the boy and a candy bar.

The grandmother testified for the defense that when she saw the boy after the incident he had no signs of having been molested but did have a tick bite on his penis.

In response to Peebles' motion for a directed verdict at the end of the State's evidence, the Court stated that the boy's statement that he got some milk from Peebles' dingdong was sufficient to indicate penetration. Apparently referring to the term "dingdong," the Court recognized that the terminology being used was "imprecise." No challenge to the testimony on that basis was made at the trial, and none is made on appeal.

In response to Peebles' contention that the hearsay statement was not corroborated, the Court found corroboration in the testimony of Dr. Ingram. The directed verdict motion was renewed at the conclusion of all the evidence. In making that determination whether there was sufficient evidence to go to the jury, the evidence and all reasonable inferences from it are viewed most favorably to the State, *Blaney* v. *State*, 280 Ark. 253, 657 S.W.2d 531 (1983), disregarding any other possible trial errors, *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984).

■ Circumstantial evidence may be sufficient to take the question to the jury. *Still* v. *State*, 294 Ark. 117, 740 S.W.2d 926 (1987). In a case similar to this one, *Bryan* v. *State*, 288 Ark. 125, 702 S.W.2d 785 (1986), we found substantial evidence of rape by deviate sexual activity even though there was only a hearsay statement of the child victim, admitted through the testimony of the child's father who, like the mother in this case, was the witness who related the circumstantial evidence we held sufficient. We hold the evidence was sufficient in this case to take the case to the jury.

## 2. The physician's statement

Peebles contends Dr. Ingram's testimony should not have been admitted because he had not previously been qualified to testify as an expert, had never before used a Wood's lamp in a sexual abuse investigation, and ultimately conceded that the lamp could show up substances other than semen.

■ The issue of whether to permit one to be qualified as an expert and to give opinion evidence as an expert falls within the discretion of the trial court. *Dumond* v. *State*, 290 Ark. 595, 721 S.W.2d 663 (1986). Dr. Ingram testified with respect to his training as a physician, including study of investigation in child abuse cases. We find no abuse of the trial court's discretion.

## 3. Hearsay

The most difficult aspect of this case is the Court's ruling that Rule 803(25) permitted the mother to testify as to what the boy said. It should be noted at the outset that Peebles does not challenge the constitutionality of the Rule or complain that he was not afforded the opportunity to confront his accuser. His sole challenge is to the trial Court's determination, made pursuant to Rule 803(25), that the boy's statement possesses a reasonable likelihood of trustworthiness. He argues that one of the criteria for making the determination is the Court's observations of the child as a witness. In this case, as noted above, the child told the Court nothing.

If the issue here were the credibility of the mother, there would be real doubts, given the evidence of her history and mental condition. Her credibility, however, was an issue for the jury to determine. The question before us, assuming the mother's testi-

mony was true, is in the words of Rule 803(25), the "reliability-credibility" of the boy's statements.

In *Hughes* v. *State*, 292 Ark. 619, 732 S.W.2d 829 (1987), we in an *obiter dictum* sustained an appellant's argument that Rule 803(25) requires that the child declarant appear before the trial judge "to establish the reliability-credibility of his statements if they are to be introduced at trial." We held that there was substantial compliance with the requirement by the fact that the child testified at the trial in that case.

Here, the boy did appear before the judge, but nothing the child did or said can be held by us to have sustained the court's ruling admitting the hearsay version of his testimony. The judge was obviously aware of the Rule, as he read parts of it to counsel at the hearing. His decision must have been based upon one of the other criteria stated in the Rule. They are:

a.   the age of the child

b.   the maturity of the child

c.   the time of the statement

d.   the content of the statement

e.   the circumstances surrounding the giving of the statement

f.   the nature of the offense involved

g.   the duration of the offense involved

h.   the relationship of the child to the offender

i.   the reliability of the assertion

j.   the reliability-credibility of the child witness before the Judge

k.   the relationship or status of the child to the one offering the statement

l.   any other corroborative evidence of the act which is the subject of the statement

m.   any other factor which the Court at the time and under the circumstances deems relevant and appropriate.

█ Many of these criteria do not seem to be useful in the context of this case. We believe, however, the Court could have based the decision to admit the testimony on the fact that it was the boy's mother to whom the statement was allegedly made and which he was unable to repeat in court. In addition, the assertion that the boy had made the statement was corroborated by the pre-trial testimony of the grandmother and the aunt. It was also corroborated by the testimony of Dr. Ingram expressing the opinion that there was semen around the boy's mouth and elsewhere on his body soon after the alleged event. We find no error in the admission of the statement.

### 4. The photographs

Prior to the beginning of the trial, the prosecutor announced that she had some pornographic photographs and magazines she wished to introduce into evidence but was not sure if she could do so. Defense counsel said he "obviously" would object to questions about them. The prosecutor warned that if any witness testified that Peebles was just a "straight" person, she was armed with these materials and would use them for impeachment.

When the prosecutor was questioning the grandmother, she asked the grandmother if she was aware that Peebles had some "sexual perversions." The grandmother answered "No ma'am. I knew he had the magazines." Defense counsel objected and complained that the prosecutor was trying to "bootstrap" herself into a position to introduce the items or questions about them when he had not opened the door by any such inquiry. The Court allowed the inquiry to go "a little further." The prosecutor then asked what kind of magazines, and the response was "girly magazines." She then asked if the grandmother knew Peebles kept some photographs. The grandmother said she had seen them "that night." At that point the court interrupted the examination. The photographs to which the prosecutor referred were pictures of Peebles, taken by him, of himself in various stages of erection.

Neither the photographs nor any magazines were introduced into evidence. The jury was not informed as to the nature of the photographs. The most they heard was that Peebles had possessed magazines "like Hustler."

While the questions asked were probably irrelevant, the

testimony of the grandmother was ultimately not unfavorable to Peebles. She concluded by saying that she had no problem with him possessing such materials, as it was "his property, his life."

Peebles cites cases, such as *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986), in which photographs which were shown to the jury or admitted in evidence at trial were held to be inadmissible on appeal. While we are not persuaded by those cases because the facts are different here, we are concerned about his argument that counsel questioned the grandmother further about the magazines and photographs after the Court had told her she could go no further on the matter.

After the Court had ruled she could go no further on the issue, the prosecutor asked: "It's your testimony that the photographs that you viewed that were taken from Abram's trailer that night, you don't have any problem with those materials?" The grandmother responded: "It bothers me a little bit, yes, ma'am, but I consider that is his property, his life."

■■ We agree with Peebles' argument, supported by his citation of *Walker* v. *State*, 138 Ark. 517, 212 S.W. 319 (1919), that it is a trial court's duty to maintain control of the trial and to prohibit counsel from making improper argument or engaging in improper questioning. We also agree that counsel should not have asked the question after being limited by the Court. There was, however, nothing new in the question, and we do not find the sort of prejudice in it, and certainly not in the grandmother's answer, which requires reversal. *Cherry* v. *State*, 302 Ark. 462, 791 S.W.2d 354 (1990); *Taylor* v. *State*, 299 Ark. 123, 771 S.W.2d 283 (1989).

Affirmed.

BROWN, J., concurs.

DUDLEY, J., dissents.

ROBERT L. BROWN, Justice, concurring. I concur in the result but only because we are not presented with the crucial issue in this case—the appellant's right to confront and cross-examine the primary witness against him. Here, the appellant appears to have been denied that right.

The four-year-old boy testified at the Rule 803(25) hearsay

hearing that the appellant did nothing wrong to him and that he had not told his mother that the appellant had harmed him in any way. The appellant was present at the hearing, and his counsel did not cross-examine the boy for obvious reasons. Following the hearing the trial judge ruled that the boy's mother could testify at trial regarding statements she said he made to her which incriminated the appellant. The mother did testify at trial about the boy's incriminating statements. The boy did not testify. Nor was the fact that the boy exonerated the appellant at the Rule 803(25) hearing brought out at trial. The result of all this is the appellant did not have an opportunity to confront or cross-examine the boy, and the jury was not able to assess the boy's credibility.

In 1988, the United States Supreme Court emphasized the right of the accused not only to cross-examination but also to a face-to-face confrontation with the accuser in molestation cases. *See Coy* v. *Iowa*, 487 U.S. 1012 (1988). Prior to *Coy* the Court had held that when the reliability of the declarant is not called into question, hearsay testimony may be presented so long as it falls within a firmly rooted hearsay exception. *See Bourjaily* v. *United States*, 483 U.S. 171 (1987). The function of Rule 803(25) is to guarantee that trustworthiness.

In this case the reliability of the boy has been called into question, since he gave contradictory testimony to the trial judge, and the mother's credibility is suspect as the majority opinion aptly states. Under these circumstances the right of the accused to confront his accuser and cross-examine him appears paramount.

I do not suggest, by this opinion, that the right to confront witnesses is absolute. It may readily bow to other competing interests such as the emotional trauma that could be visited upon the child witness. This raises the question of whether a videotaped deposition of the child, as authorized by Ark. Code Ann. § 16-44-203 (1987), might have been arranged by the state to reduce that trauma. That statute contemplates a videotaped deposition in the trial judge's chambers with the defendant and child both present. Such a deposition would eliminate the confrontation clause problems and reduce the emotional trauma to the child inherent in a jury trial.

ROBERT H. DUDLEY, Justice. I dissent from that part of the majority opinion which affirms the trial court's evidentiary ruling that the mother could testify as to what her three-year-old child told her. The majority, in my opinion, has mistakenly found the statement admissible under A.R.E. Rule 803(25), just as the trial court did.

The twenty-five (25) different exceptions to the hearsay rule, which are listed in Rule 803, are phrased in terms of the non-application of the hearsay rule, rather than in positive terms of admissibility. This was done by the drafters in order to reject any implication that other possible grounds for exclusion are eliminated. *See* J.B. Cotchett & A.B. Elkind, *Federal Courtroom Evidence*, 256 (2d Ed. 1988). Among those other grounds for exclusion is the lack of competency by the declarant.

Before a witness can testify at trial, either directly or through the testimony of another, the witness must be competent. Wigmore states:

> The hearsay rule is merely an additional test or safeguard to be applied to testimonial evidence otherwise admissible. The admission of hearsay statements by way of exception to the rule, therefore presupposes that the assertor possessed the *qualifications of a witness.* . . . (emphasis in the original.)

5 J.H. Wigmore *Evidence* § 1424 (Chadbourne rev. 1979).

The qualification of a person to be a witness is a preliminary question to be determined by the trial court. The criteria for determining the competency of a witness are: (1) the ability to understand the obligation of an oath; (2) an understanding of the consequences of false swearing; (3) the ability to receive and retain accurate impressions; and (4) the capacity to transmit a reasonable statement of what has been seen, felt, or heard. *Chambers* v. *State*, 275 Ark. 177, 628 S.W.2d 306 (1982).

Here, the declarant was a three-year-old boy, who was labeled a "slow learning child" by the deputy prosecutor, and a "slightly retarded" three-year-old child by the defense attorney. His competency was assessed by the trial judge at a preliminary hearing. Because it is so unarguably clear from that hearing that the child was not competent, it is set out in full:

(THEREUPON, Michael Cook was brought into Chambers; then the following proceedings occurred:)

THE COURT: Michael. Michael. Hi.

MICHAEL COOK: Hi.

THE COURT: Come here. Come here. I want to talk to you a minute.

MICHAEL: No.

THE COURT: Well, let your daddy sit right here. I want you to sit right here and your daddy can sit right beside you. Right here. Sit right here. Sit in his lap. How are you?

MICHAEL: Fine.

THE COURT: You're a nice looking young boy. How old are you?

MICHAEL: Four.

THE COURT: Four years old? My goodness gracious. Where'd you get that pretty shirt?

MICHAEL: At home.

THE COURT: At home? Do you know who this is over here? That's Mrs. LaRue. [Deputy Prosecutor] She's a friend of mine and she's a lawyer. She wants to talk to you a little bit. Okay? You see that lady back there? See that woman way back there? She has to—Everything that you say, she's got to write it down on a piece of paper. So, will you talk up real loud? Oh, please do. Talk up real loud. Say, "Yes, sir."

MICHAEL: Yes, sir.

THE COURT: Okay. That's good. If you do that when she talks to you, then she can write it down. Okay?

MRS. LaRUE: Hi, Michael.

MICHAEL: Hi.

MRS. LaRUE: Keep your hand down from your mouth so everybody can hear what you're saying. Okay? Will you state your name, please? Will you tell us what your name

is?

MICHAEL: Michael Cook.

MRS. LaRUE: Speak up.

THE COURT: Louder.

MRS. LaRUE: Can you say that louder? Say what your name is.

MICHAEL: Michael Cook.

MRS. LaRUE: There you go. That's good. How old are you?

MICHAEL: Four.

MRS. LaRUE: Four years old. Do you have any brothers or sisters?

MICHAEL: Yeah.

MRS. LaRUE: Who?

MICHAEL: At home.

MRS. LaRUE: Who? Who? Do you have a little brother?

MICHAEL: Yeah.

MRS. LaRUE: What's his name.

MICHAEL: Justin.

MRS. LaRUE: Justin? How old is Justin?

MICHAEL: Four.

MRS. LaRUE: Justin's not four. How old is he?

MICHAEL: One.

MRS. LaRUE: There you go. That's good. Who are you with? Who are you sitting with?

MICHAEL: My daddy.

MRS. LaRUE: Yeah. Michael, do you know who Abram [the appellant] is? You know who Abram is.

MICHAEL: What?

MRS. LaRUE: Huh? Do you remember who Abram is? Is Abram your uncle?

THE COURT: Speak up.

MRS. LaRUE: Take your hand out of your mouth.

THE COURT: Speak up. Do you know who Abram is? Do you remember who Uncle Abram is?

THE COURT: Say something. Say something. Answer her out loud.

MRS. LaRUE: Yes? No?

MICHAEL: No.

MRS. LaRUE: You don't know who he is?

MICHAEL: No.

MRS. LaRUE: Do you remember who used to live next to your trailer? Remember when you lived in a trailer where your grandmother lives?

MICHAEL: Yeah.

MRS. LaRUE: You remember that? Who else lived over there?

MICHAEL: My papaw.

MRS. LaRUE: Who else?

MICHAEL: My meemaw.

MRS. LaRUE: Okay. Who lived in the other trailer?

MICHAEL: I don't know.

MRS. LaRUE: Did you live in one of the trailers? Did you and your mom and dad at one time live over there?

MICHAEL: (moves head)

THE COURT: Is that, "No"?

MICHAEL: No.

MRS. LaRUE: You never did?

MICHAEL: (moves head)

THE COURT: No?

MRS. LaRUE: And you can't tell us who Abram is? You don't want to or you can't?

MICHAEL: I don't want to.

MRS. LaRUE: How come you don't want to?

MICHAEL: I don't want to.

MRS. LaRUE: Are you afraid?

MICHAEL: Cause.

MRS. LaRUE: Cause why?

MICHAEL: I don't want to.

MRS. LaRUE: Do you want to ask him any questions?

MR. MADDEN [Defense Lawyer]: I don't think so.

MRS. LaRUE: Do you think you could just tell us while the Judge is here who Abram is. He wants to know.

MICHAEL: Yeah.

MRS. LaRUE: Would you just look at him and tell him who Abram is?

MICHAEL: He's Abram.

THE COURT: But who is Abram, Michael?

MICHAEL: Michael.

THE COURT: No. Who is Abram? Is he your uncle?

MICHAEL: Yeah.

THE COURT: Where does he live? Do you know where he lives?

MICHAEL: Yeah. By my meemaw.

THE COURT: Over there in that other trailer? Okay, Do you remember Abram—Is he in the room today? Is Abram in the room today?

MICHAEL: (moves head)

MRS. LaRUE: Did you look?

THE COURT: Look over there and see if you see him. Do you know that man over there?

MICHAEL: No.

THE COURT: Huh?

MICHAEL: No.

THE COURT: You don't know that man over there? Do you want to walk over there and look at him? You don't know him? Speak up. Do you know him? Yes or no?

MICHAEL: No.

THE COURT: That's not Abram, huh? I thought that was Abram. Is it?

MICHAEL: No.

THE COURT: Did Abram do something to you several months ago, sometime back?

MICHAEL: (moves head)

THE COURT: He didn't? Did you tell your mother he did? Speak up. Is that yes or no?

MICHAEL: No.

THE COURT: He didn't do anything to you and you didn't tell your mother?

MICHAEL: No.

THE COURT: No?

MICHAEL: No.

THE COURT: Okay. Did that man over there ever do anything to you?

MICHAEL: No.

THE COURT: He didn't? Okay. Anything else?

MRS. LaRUE: Come and stand right here. Could you do that? Could you come and stand right here? You don't want to do that? Would you ask Mr. Peebles to look this

way.

MRS. LaRUE: Michael. Michael. Look at this man. Do you know who this is?

THE COURT: Can you see him good? Can you see him good? Speak up. Yes or no?

MICHAEL: Yeah.

THE COURT: But it's not Abram?

MICHAEL: No.

THE COURT: It's not Abram? Okay.

MRS. LaRUE: Are you scared, Michael?

MICHAEL: (moves head)

MRS. LaRUE: You're not scared in here?

MICHAEL: No.

MRS. LaRUE: That's good.

THE COURT: Do you know this man right here? Who is that?

MICHAEL: Papaw.

THE COURT: I thought that was Abram. That's not Abram? If that's not Abram, that must be Abram.

MICHAEL: It is.

THE COURT: Which one?

MICHAEL: (points)

THE COURT: That's Abram? Well, you just told me it wasn't. Are you sure this is not Abram? This is your papaw? So, that's Abram over there? Speak up. Yes or no?

MICHAEL: Yeah.

THE COURT: Now, did that man do something to you sometime back?

MICHAEL: (moves head)

THE COURT: Well, did this man do something to you?

You told your mother somebody did, didn't you? Huh?

MRS. LaRUE: Do you remember talking to your mother one day? Remember when your daddy came home from work. You remember all that?

MR. MADDEN: Can I ask a question?

THE COURT: Sure.

MR. MADDEN: Michael, have you ever talked to this lady? Do you know who this lady is? Huh? Have you talked to her before? You have never talked to her before?

MICHAEL: (moves head)

MR. MADDEN: Okay?

THE COURT: Is that no?

MICHAEL: No.

THE COURT: Have you ever talked to me before?

MICHAEL: No.

THE COURT: Do you want to come back and talk to me again sometime? Okay.

(THEREUPON, Michael Cook left Chambers; then the following proceedings occurred:)

It is readily apparent from the foregoing testimony that the child was not able to receive and retain accurate impressions or to communicate a reasonable statement of what he had seen, felt or heard with regard to the alleged incident, as is required for a competent witness. The trial court did not rule on the declarant's competency, and the majority opinion acknowledges that "nothing the child did or said can be held by us to have sustained the court's ruling." It is my opinion that the child was not a competent witness and, therefore, his statement was not admissible either directly or through his mother. That should decide the evidentiary issue.

However, the trial court went a step further and ruled that, pursuant to Rule 803(25), the statement was corroborated, and, therefore, admissible. The majority opinion makes the same error. In short, both the trial court and the majority tacitly admit

that the child is not competent to testify but hold that because the statement is corroborated the mother can testify as to what the incompetent declarant said. If corroboration truly makes an incompetent witness competent, the incompetent witness could testify if his statement where corroborated. In a comparable situation, Lord Blackburn said, "It is impossible that if a person said something, and could not himself if alive have been permitted to give testimony to prove it, he can by dying render that statement admissible. I think that is a self-evident proposition." *Dysard Peerage Case*, L.R. 6 App. Cas. 489, 504 (1881). Indeed, the Supreme Court of the United States has held that corroboration is not relevant to the issue of competency. *Idaho* v. *Wright*, 497 U.S. ___, 110 S.Ct. ___, 58 U.S.L.W. 5036 (1990).

Even forgetting the foregoing reasoning, if one would analyze the facts of this case solely under Rule 803(25), this case still must be reversed because the trial court abused its discretion in holding that the statement offered possessed a reasonable likelihood of trustworthiness. Rule 803(25) provides that trustworthiness is to be evaluated by twelve criteria. They are set out below along with the applicable facts:

1. Age of child—Three years at the time of the incident. This fact alone practically mandates reversal.

2. Maturity of the child—A slightly retarded three-year-old child. From his quoted testimony it is obvious he is very immature. Again, this factor mandates reversal.

3. Time of statement—Given soon after the event, thus more likely to be trustworthy.

4. Content of the statement—Sufficiently clear child-like language. More likely to be trustworthy.

5. Circumstances surrounding the giving of the statement—Testimony showed that the mother had previously falsely accused others of sexual misconduct and had a history of fabricating stories. Immediately after the offense supposedly occurred, she was leaning against a police car laughing. She did not get along with her brother, the accused. She was undergoing psychological counseling and taking antidepressants. Even by her own testimony the mother asked the child leading questions, such as, "What did Uncle Abram do?" and, before answering, he said,

"No Mommy, you'll whip me." She did not record either her questions or the child's answers, and her recollection may well not be exact. In fact, her sister and her mother say the child's statements to them at the time were markedly different.

6. Nature of the offense—Sex act with child of tender years would militate against requiring child to testify in court.

7. Duration of offense involved—Was alleged to be of short duration, while they were "fighting ding dongs." It is also material that the child did not want to leave the accused's home after the alleged incident.

8. The relationship of the child to the offender—The alleged offender is the uncle of the child.

9. The reliability of the assertion—As set out, the exact words of the child's statement are questionable. The mother testified that he said, "I had some milk from his ding dong," but the sister testified that he told her, "I wanted some milk. Uncle Abram got me some milk." The mother has been a mental patient. Her recollection is doubtful. Most importantly, the child now says the accused did not do it, and says that he did not tell his mother that the accused did it.

10. The reliability-credibility of the child witness before the judge—The testimony shows the child was not credible.

11. The relationship of the child to the one offering the statement—Mother-son relationship.

12. Other corroborative evidence—A medical doctor said the child had a substance on his chin, around his mouth, on his abdomen, and left hand which, under a Wood lamp, looked like sperm, but admittedly, a lot of other substances, such as milk, would have looked the same. This amounts to only some corroboration.

On the whole, the child's alleged statements as related through the mother do not possess a reasonable likelihood of trustworthiness, and, therefore, the trial court's ruling should be reversed.

The issue of confrontation and the issue of whether 803(25) has been validly adopted are not raised and are not addressed.

I dissent.