**The STATE of Ohio, Appellee,**

**v.**

**ROCKWELL, Appellant.** ▮

[Cite as *State v. Rockwell* (1992), 80 Ohio App.3d 157.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–686.

Decided May 19, 1992.

158

*Michael Miller,* Prosecuting Attorney, and *Joyce Anderson,* Assistant Prosecuting Attorney, for appellee.

*Paul DePascale* and *Jon J. Saia,* for appellant.

REILLY, Judge.

A Franklin County Court of Common Pleas jury found defendant-appellant, Charles Rockwell, guilty of four counts charging him with endangering children in violation of R.C. 2919.22. Each count included the specification that he caused physical harm to a person during the commission of the charged offenses.

Appellant appeals this decision and raises the following five assignments of error:

"I.   The trial court erred when it overruled the defendant's motion to dismiss for violation of his speedy trial rights.

"II.   The trial court erred by improperly allowing testimony by the victim from behind a screen hindering the defendant's ability to confront the witness, such hindrance violating his constitutional right to confrontation, prejudicing his right to a fair trial, and materially effecting [*sic*] his due process rights, such action by the court not constituting harmless error.

"III.   The trial court erred by failing to properly instruct the jury causing appellant to be prejudicially denied a fair trial, such charge affecting adversely his substantial rights, such error not constituting harmless error.

"IV.   The defendant was deprived of his state and federal constitutional rights by being denied the right to effective assistance of counsel.

"V.   The trial court erred in its verdict as it is contrary to law in that the state failed to prove the physical harm specifications and serious physical harm element, and therefore failed to make a prima facie case."

The criminal charges brought against appellant concerned his alleged mistreatment of his stepdaughters, Amanda Wooten and Alisha Turnbull. Billie Rockwell is the wife of appellant and is the mother of the two girls. In late October 1990, the family returned to Columbus after having spent time away. On November 10, 1990, Billie Rockwell went to the Whitehall Police Depart-

ment and brought a domestic violence charge against appellant based on his treatment of her. In response to Billie filing the charge, Whitehall police went to the hotel where the family was staying and found appellant, Amanda, and Alisha present.

Whitehall policeman, Mark Martin, testified that Amanda had two black eyes and a bandaged chin and that she told him that she had not eaten all day and was hungry. Alisha was lying on the floor with her eyes open and was very unresponsive. She had bruises and minor abrasions and appeared malnourished. There was a strong odor of dirty diaper in the room. The only food in the hotel room was baby formula. Appellant was arrested and taken to the Whitehall jail on the domestic violence charge. When searched at the police station, appellant was found to have $235 on him. The children were taken to Children's Hospital to ascertain their physical condition. In November 1990, Amanda was seven years old and Alisha was five years old.

Deborah Menkus, M.D., was a resident physician working in the emergency room the evening of November 10, 1990, when Amanda and Alisha were brought in for evaluation. Dr. Menkus testified that Alisha had numerous injuries all over her body, including a swollen bruised area behind her left ear, black and blue marks on her face, especially under her nose, on her cheek, and on her chin and bruises on her shoulder, buttocks, shins, and lower legs. The color of the bruises varied, indicating that they were different ages. Alisha's diaper was drenched and may not have been changed for twenty-four hours. The skin of the diaper area was irritated and there were vesicular blisters on her back side. Alisha appeared very malnourished. She was a fifty percentile size for a two-year-old. Alisha was neurologically impaired: she had minimal interaction with others and was not developmentally at the level of a five-year-old. Alisha was admitted for nutritional reasons.

Dr. Menkus testified that Amanda had several bruises of varying ages on her. The significant bruises included a raised area above her right eye, two black eyes, a cut on her chin, and bruises on her arms and back. Amanda said that she was very hungry and ate a good deal of food. Amanda said that she had fallen in the bathroom while reaching for a light switch and that that was how she had received her black eyes. Amanda was also admitted to the hospital.

Initially, Amanda offered no explanation for Alisha's bruises. Eventually, Amanda stated that appellant had been working with Alisha in an attempt to teach her to stand and walk and that she had incurred the bruises because of this. In Dr. Menkus's opinion, Alisha's bruises were not consistent with this explanation.

Billie Rockwell testified that she started working at a waffle house on October 30, 1990, from 10:00 p.m. to 6:00 a.m. Billie stated that she seldom saw her children and that appellant threatened her if she attempted to see them. Appellant kept the girls behind a curtain he had hung in front of a closet-type space in the room. Billie saw Amanda's black eyes on November 9 and, when she questioned appellant about them, he told her "[s]he pissed me off."

The next day Billie went to the Whitehall Police Department and filed the domestic violence charge against appellant. Billie testified that the week before she brought the charge against appellant, he had given her a black eye. She had also heard appellant verbally abuse her daughters, had seen him slap Alisha, and had observed him "pop" Amanda in the mouth a time or two. Billie had not reported the situation sooner because appellant had threatened her life and the life of her daughters. To her knowledge, the incident on or about November 9, 1990, was the most severe to date. She added that, in October 1990, she had noticed that the children had lost weight.

Policeman Mark Martin testified that Billie's original domestic violence report concerned herself and that, as a second issue, she stated that appellant abused her children both physically and mentally. She also told him that the domestic violence against her children was basically a continuing course of conduct, but provided no specifics.

Detective Mark Thomas of the Whitehall Police Department went to Children's Hospital once the suspected child abuse report was filed. He photographed the children and spoke with Amanda. His testimony about the appearance of the children was consistent with that of Dr. Menkus. The photographs which were admitted into evidence supported the testimony describing the condition of the children.

Detective Thomas also interviewed appellant about the children. Appellant informed Detective Thomas that he cared for the children ninety percent of the time, and that he fed the children whenever they were hungry, which was all the time. Initially, he said that he did not know how Amanda had received her black eyes but, after being asked if they could have resulted from Amanda falling out of the tub, he indicated that she had fallen out of the tub on November 7. Thomas was later recalled as a witness. He stated that when he asked appellant another time how Amanda got her black eyes, appellant told him that he and Amanda had been having a talk which "got out of hand," that he told Amanda to go to the closet area, that when she passed him he tapped her on the back of the head, and that she tripped over the carpet and her forehead hit the wall.

Thomas testified that Amanda supplied more than one explanation for her black eyes. At one time, she told him that she fell getting out of the tub. Another time she informed him that she slipped and fell in the bathroom when she tried to turn on the light.

Amanda testified at trial. When she testified, a screen was placed between Amanda and appellant so that she could not see him while she testified. Amanda testified that, while the family was staying at the hotel, the situation was "terrible" because appellant "was hitting on [her]." She also said that appellant hit Alisha. Amanda testified that she got her black eyes because appellant slammed her against a wall, and that he had instructed her to tell the police that she had tripped over the bathroom tub. At the hospital, Amanda informed a doctor that appellant had slammed her against the wall. According to Amanda, appellant did not let Billie see her. He made the girls stay in the small room behind the curtain because he did not want to see them. Amanda stated that they did not eat much when appellant was in charge and that she was often hungry.

Thelma Doyle, a case worker with Franklin County Children's Services ("FCCS"), testified for the defense. Doyle became involved with Amanda and Alisha in March 1989 when Alisha was admitted to the hospital with a subdural hematoma, a swelling in the brain. In September 1989, Alisha suffered a second subdural hematoma, and a neglect/dependency action was filed. Doyle added that the feeding history which Billie supplied was inconsistent with Alisha's weight loss and that Billie had missed appointments that Alisha had with doctors.

When Doyle first met appellant in April 1989, she was told that his name was Tim Clark. In October 1989, Billie told Doyle that appellant's real name was Charlie Rockwell, not Tim Clark. She explained that they had used the false name because they did not want FCCS to learn of a prior FCCS case in which he had been charged with endangering a handicapped child, the daughter of a previous girlfriend. Billie also told Doyle that appellant had lost his three children in Florida and that mistreatment had been involved. Billie added that appellant had been physically abusive toward her and smacked Amanda in the face and that she was not certain whether he had been feeding the children properly. Upon learning this information, Doyle took Billie and the children to Choices. Doyle stated that abuse charges were not filed because Billie was cooperating and appellant had moved out of the state.

Doyle stated that FCCS believed that appellant was the abuser of the two children in this case and that Billie's involvement was limited to failing to protect the children from the abuse which appellant inflicted.

Redirect examination clarified that Doyle's knowledge of Tawana Housan (the child of appellant's prior girlfriend) was only based upon the case record that FCCS had for Tawana. Further, while appellant had been charged with child endangering, he had not been convicted. Doyle admitted that they had never been able to confirm that appellant had lost custody of his children in Florida and that he had no past convictions for domestic violence, child abuse, or child endangering. Moreover, she acknowledged that appellant had some positive characteristics.

The prosecution submitted into evidence a letter which a document examiner testified was written in appellant's handwriting. The letter was dated November 6, 1990. Appellant wrote that, at the time he was writing, Billie, Alisha, and Amanda had black eyes because of him. He vowed that he would never lay a hand on any of them again and that before he would hit them again, he would leave and be by himself. He expressed regret for having hurt them and stated that he loved them very much. Appellant denied writing this note.

In his first assignment of error, appellant contends that the trial court erred when it overruled his motion to dismiss on the basis that his speedy-trial rights had been violated.

Appellant was arrested and incarcerated based upon the domestic violence charge which Billie brought against him on November 10, 1990 and was kept in jail from this date until his trial date. The child endangering charges were filed against appellant on November 14, 1990. Appellant's indictment for child endangering with specifications was filed January 15, 1991. Appellant was arraigned on February 4, 1991 and his attorney was also appointed on this date. Appellant's trial attorney learned of his appointment on February 6, 1991, and received notice of the February 11, 1991 trial date on February 8, 1991.

At the February 11, 1991 trial, appellant's counsel moved to dismiss for lack of speedy trial. The trial court denied appellant's motion to dismiss. At this time, appellant's counsel requested a continuance, stating that he had not been notified of the trial date until a phone call on February 8, at 4:30 p.m. He added that he had mailed his request for discovery on February 7, that he had not received any of the requested discovery until the day of the trial, and that he had yet to receive all of it. The court continued the case over the state's objection to March 11, 1991. Appellant waived his right to speedy trial for the period of this continuance.

On March 11, 1991, upon motion of the court, the trial was continued until March 18, 1991. The stated reason for the court's *sua sponte* continuance

was that the assigned judge was ill and that there were no available judges to hear the case. The defense attorney signed the continuance over objections.

On March 18, 1991, the trial proceeded. Defense counsel renewed his motion to dismiss on speedy-trial grounds. The court denied the motion.

R.C. 2945.71 sets forth the requirements for speedy trial and provides that a person who is charged with committing a felony must be brought to trial within two hundred seventy days after his arrest. R.C. 2945.71(C)(2). R.C. 2945.71(E) provides that when the accused is held in jail in lieu of bond on the pending charge, each day shall be counted as three days. In this case, appellant was held in jail. Consequently, he needed to be brought to trial within ninety days of his arrest.

R.C. 2945.73 provides that if the accused is not brought to trial within the time requirements of R.C. 2945.71 and 2945.72, the accused shall be discharged. The state and prosecution must strictly comply with R.C. 2945.71 and 2945.73. *State v. Reeser* (1980), 63 Ohio St.2d 189, 17 O.O.3d 117, 407 N.E.2d 25.

In support of his speedy-trial contention, appellant makes three arguments. First, appellant maintains that the trial court erred when it overruled his February 11, 1991 speedy-trial motion. Calculating his time limit from his arrest date, November 10, 1990, appellant argues that his initial trial date was scheduled for the ninety-third day after his arrest.

Appellant was arrested on November 10, 1990 based on the domestic violence charge which Billie brought against him. This case concerns the child endangering charges which were not brought against him until November 14, 1990. Calculating appellant's speedy-trial period from November 14, the trial date scheduled on February 11 was the eighty-ninth day. Thus, this argument does not establish a violation of appellant's speedy-trial rights.

Second, appellant argues that the continuance which the court granted on February 11, 1991, cannot be attributed to him since his attorney was only given a weekend to prepare for trial and was improperly forced to choose between a fair trial and a speedy trial. The defense counsel requested the continuance which the court granted on February 11, 1991 because discovery was not complete.

R.C. 2945.72 identifies when the speedy-trial period may be extended. Pertinent to the present assignment of error is R.C. 2945.72(C), which provides that the trial date may be extended by:

"Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law."

R.C. 2945.72(H) is also pertinent to this appeal and provides that the trial date may be extended by:

"The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

While appellant's counsel may have requested a continuance because he did not receive notice of his appointment until three days before the trial and had not received all of his requested discovery on the day of trial, R.C. 2945.72(C) does not provide a basis for finding that the continuance granted on February 11, 1991 was improperly attributed to appellant. Appellant had requested court-appointed counsel at his arraignment, the court appointed counsel that day and counsel received notice two days later. While time extensions of R.C. 2945.72 are to be strictly construed against the state, *State v. Singer* (1977), 50 Ohio St.2d 103, 4 O.O.3d 237, 362 N.E.2d 1216, R.C. 2945.72(C) expressly discusses situations when there has been a lack of diligence in appointing counsel upon the request of the accused. Such a situation is not present in this case.

R.C. 2945.72(H) must also be considered when addressing the question of whether the continuance of February 11 was a proper extension of the speedy-trial time period. R.C. 2945.72(H) draws an important distinction between continuances granted on the accused's motion and continuances granted other than upon the accused's motion. The key difference is the requirement of reasonableness when the extension is due to the motion of someone other than the accused. If it was granted upon the accused's motion, there is no requirement of reasonableness.

In *Columbus v. Jordan* (Feb. 21, 1991), Franklin App. No. 90AP–660, unreported, 1991 WL 23809, the defendant's trial date was not set until five days before the trial. Defendant had an attorney, but he was never reached and did not learn of the trial or appear for trial. Instead, a public defender stood in for the defendant with only a few hours' notice. While defendant wanted to go ahead with trial, the court *sua sponte* continued the case so that defendant would receive effective assistance of counsel. We found that this extension was improper based upon our conclusion that this *sua sponte* continuance was not *reasonable*. In *Jordan*, the defendant had been arrested on December 28, 1989 and was not indicted until March 12, 1990. In *Jordan*, we found that the continuance was not reasonable due to the absence of an explanation for the length of time between the arrest and the indictment and the absence of evidence that defendant's attorney was absent on the date of trial for an invalid or contrived reason.

■ Unlike *Jordan,* the present case does not involve a *sua sponte* continuance, hence the reasonableness requirement does not apply. Nor do we find any statutory support or case precedent for finding an accused's motion for a continuance to actually be a *sua sponte* motion for continuance by the court in situations such as the present.

We also find that our decision *Columbus v. Bonner* (1981), 2 Ohio App.3d 34, 2 OBR 37, 440 N.E.2d 606, is distinguishable from the present situation. The significant distinction is that the defendant requested appointed counsel on November 19, 1979 and that this counsel was not appointed until January 7, 1980, the date of trial. R.C. 2945.72(C) specifically covers this situation.

Accordingly, we find that the facts of this case do not support treating the continuance granted at defense counsel's request as a *sua sponte* continuance. Consequently, this argument will not support appellant's assignment of error.

■ Appellant's third argument in support of this assignment of error is that the trial court erred when it entered the *sua sponte* continuance on March 11, due to the assigned judge's illness and the unavailability of another judge to hear the case. This continuance was granted for the period of one week. Because this continuance was *sua sponte,* R.C. 2945.72(H) governs and it must be reasonable. The Ohio Supreme Court has held that when a court *sua sponte* continues a trial date beyond the time limits of R.C. 2945.71, its reasonableness is to be determined based on its purpose and length beyond the time limit. *State v. Lee* (1976), 48 Ohio St.2d 208, 2 O.O.3d 392, 357 N.E.2d 1095.

■ Appellant referred to *State v. Carter* (Aug. 21, 1990), Franklin App. No. 89AP–1282, unreported, 1990 WL 121869, to support his claim that this *sua sponte* continuance was not reasonable. In *Carter,* the journal entry merely stated that the court docket did not give time for the case to be tried as scheduled. In the present case, an explanation was given, namely that the judge was ill.

We find that the one-week continuance due to the illness of the assigned judge was reasonable. The case was continued only for one additional week and the record does not indicate that if the judge had been healthy, the trial would not have been able to proceed as scheduled.

Appellant's first assignment of error is overruled.

■ In his second assignment of error, appellant asserts that the trial court erred by improperly allowing a victim to testify from behind the screen, which hindered appellant's ability to confront the witness, violated his constitutional

right to confrontation, prejudiced his right to a fair trial and materially affected his due process rights.

Appellee concedes that this was an error by the trial court, but argues that the error was harmless. Appellant disputes this and contends that the error was prejudicial. This court must determine whether or not it was harmless error for the court to permit Amanda to testify behind a screen.

In *Coy v. Iowa* (1988), 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857, the United States Supreme Court provided that when an individual has been denied his constitutional right of a face-to-face confrontation it will be grounds for reversal unless the state can prove that this error was harmless beyond a reasonable doubt. *Id.* at 1021–1022, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. The question of harmlessness must be determined on the basis of the evidence which remains aside from the witness's testimony. *Id.* In *Coy*, the court referred to its standard of harmless error beyond a reasonable doubt in *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. In *Harrington v. California* (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, the United States Supreme Court added to its standard of harmless error which it had defined in *Chapman*. In *Harrington*, the court held that when evidence supplied in violation of a constitutional right was merely cumulative and when the other evidence against the accused was overwhelming, the reviewing court could conclude beyond a reasonable doubt that the denial of the accused's constitutional rights was harmless error.

Thus, this court must decide whether there was admissible evidence which was overwhelming evidence of appellant's guilt.

Admissible evidence which supported a guilty verdict was presented at trial. Billie Rockwell testified that appellant mistreated her and the children and that appellant told her that Amanda received her black eyes because she had "pissed him off." The hotel room contained no food except infant formula. Billie testified that appellant would not let her bring food home because of money. A Whitehall police officer testified about the appearance and condition of the girls when he saw them at the hotel where they were staying. The police officer also testified that there was no bathtub, only a shower in the hotel room, thus rebutting appellant's testimony that Amanda's black eyes resulted from a fall against the tub or in the tub. Dr. Menkus testified about the condition of the girls when she treated them at the hospital. Photographs taken of the girls when they were at the hospital were admitted as evidence. More than one witness testified that Amanda ate a lot of food at the hospital. The letter which appellant had written in which he stated that he had given Billie and the girls black eyes was introduced as evidence.

Although Amanda's inadmissible testimony no doubt influenced the jury's finding that appellant was guilty of the charges, we find that there was sufficient admissible evidence against appellant and conclude beyond a reasonable doubt that the denial of appellant's constitutional right to confrontation was harmless.

Appellant's second assignment of error is sustained to the extent of his contention that the trial court erred in permitting Amanda to testify behind the screen, but is overruled as to his contention that this error was prejudicial.

In his third assignment of error, appellant asserts that the trial court committed prejudicial error when it failed to properly instruct the jury. Appellant claims that the court improperly failed to define "duty of care," "duty of protection," or "duty of support." Appellant asserts that these were essential elements of the offense and that failure to define them permitted the jury to speculate and guess as to the meaning of these terms.

A reviewing court will not reverse a conviction in a criminal case due to jury instructions unless it is found that the jury instructions amount to prejudicial error. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph two of the syllabus. Jury instructions should outline the issues, state the applicable principles of law, and clarify the jury's role in the case. *Bahm v. Pittsburgh & Lake Erie Rd. Co.* (1966), 6 Ohio St.2d 192, 35 O.O.2d 307, 217 N.E.2d 217. Trial courts are required to include the substance of submitted proposed jury instructions when they are correct and pertinent. *State v. Guster* (1981), 66 Ohio St.2d 266, 268, 20 O.O.3d 249, 250, 421 N.E.2d 157, 159. A jury instruction is proper when it adequately informs the jury of the law. *Linden v. Bates Truck Lines, Inc.* (1982), 4 Ohio App.3d 178, 4 OBR 280, 446 N.E.2d 1139.

Appellant's submitted instructions for duty of care, protection, and support addressed only to whom a person owed these duties—these instructions did not address what was meant by care, protection, or support. The two major areas of dispute in this case were (1) how the children came to be in the physical condition which they were in, and (2) whether their condition rose to a level of serious physical harm. Appellant's submitted instructions were not pertinent to the issues. The trial court did not commit prejudicial error when it did not instruct the jury on to whom a person owes the duty of care, protection, and support or on the definition of these duties.

Appellant also alleges an inconsistency concerning the court's instructions on the issue of duty to support. The instructions which appellant refers to were not inconsistent. The first instruction pointed to by appellant concerned counts one and two and was proper for those counts. The language alleged to

be inconsistent with the instructions concerned counts three and four and was proper in regard to those counts.

Appellant's third assignment of error is overruled.

In his fourth assignment of error, appellant asserts that he was denied his constitutional right to effective assistance of counsel. In support of this assertion, appellant relies on testimony supplied by Thelma Doyle. Appellant's trial attorney called Thelma Doyle as part of his case. Appellant states that Doyle made several hearsay statements, both on direct and cross-examination, which he argues his counsel should have attempted to exclude. Doyle's testimony on the transcript pages which appellant cites in his brief primarily concerned information Billie had told her in October 1989 concerning his involvement in the Tawana Housan case and the unsubstantiated assertion that he had lost custody of his children in Florida. Appellant argues that this testimony was prejudicial and that defense counsel's failure to attempt to exclude this testimony constituted ineffective assistance of counsel.

The United States Supreme Court has set forth a two-prong test for determining whether a person has been deprived of his constitutional right to effective assistance of counsel. The test is contained in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and provides that a claim of defective assistance of counsel must pass a two-component test: it must be shown that counsel's performance was deficient, *i.e.*, that " * * * counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment * * *," and that the deficient performance prejudiced the defense, *i.e.*, " * * * that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. * * * " *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The defendant bears the burden of proof. *Id.* at 688, 693, 104 S.Ct. at 2065, 2067, 80 L.Ed.2d at 693, 697.

The court noted that it would frequently be easier to dispose of an ineffective assistance of counsel claim on the basis that sufficient prejudice was not established and that in such instances it would be the proper approach. (One need not first determine whether there was deficient performance of counsel.) *Id.* at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. The court expressed the following test for establishing prejudice:

" * * * The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

■ There is a strong presumption that counsel provided adequate assistance of counsel and that the challenged action was a sound trial strategy in the circumstances. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

■ We do not find that Doyle's testimony was determinative in the jury's finding that appellant was guilty of child endangering charges. There was sufficient evidence aside from Doyle's testimony to support the finding of guilt. Because we find that this alleged error of the defense counsel did not deprive appellant of his fair trial with a reliable result, we find that the prejudice component of *Strickland* has not been proven. Additionally, the hearsay testimony of Doyle on direct examination appears to have been brought out as part of defense counsel's trial strategy. While in hindsight this may not have been a good strategy, it did not constitute deficient performance.

Appellant's fourth assignment of error is overruled.

In his fifth assignment of error, appellant asserts that the state failed to prove the physical harm element in the charges brought against him and, consequently, failed to make a prima facie case against him.

Appellant asserts that the state failed to prove that he caused physical harm to Alisha and Amanda as alleged in the specification attached to the four counts brought against him. Appellant also asserts that the state failed to prove in each of the four counts that appellant's alleged behavior in each of the four counts resulted in "serious physical harm" to the child involved. The inclusion of this language in the four counts increased the severity of the crimes. R.C. 2919.22(D).

R.C. 2901.01(E) defines "serious physical harm" as follows:

" 'Serious physical harm to persons' means any of the following:

"(1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

"(2) Any physical harm which carries a substantial risk of death;

"(3) Any physical harm which involves some permanent incapacity, whether partial or total, or which involves some temporary, substantial incapacity;

"(4) Any physical harm which involves some permanent disfigurement, or which involves some temporary, serious disfigurement;

"(5) Any physical harm which involves acute pain of such duration as to result in substantial suffering, or which involves any degree of prolonged or intractable pain."

R.C. 2901.01(C) defines physical harm as follows:

" 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration."

Since the definition for "serious physical harm" is sufficiently broad to necessarily include "physical harm," we will only address whether "serious physical harm" resulted.

Amanda had black eyes whose variation in colors suggested that they had resulted from more than one incident. She had other bruises on her face and body and she was apparently underfed. The extent of Amanda's bruises, especially those on her head, along with testimony indicating that Amanda had not been receiving enough food for a significant period of time, leads us to conclude that the state met its burden of proving serious physical harm.

While Alisha did not have black eyes, she had bruises on her face and she was very underweight for her age. Due to Alisha's preexisting health problems which make her more susceptible to serious injuries to the brain (*i.e.*, subdural hematomas), we believe that the extent of her bruises supports finding "serious physical harm." Also, her weight indicates that she had not been fed properly over a significant period of time and provides further support for finding "serious physical harm." Finally, although testimony indicated that Alisha has suffered from developmental problems since infancy, the evidence indicated that in previous times she was more responsive than when she was admitted to Children's Hospital.

Because we find that the state proved serious physical harm and, therefore, physical harm, appellant's fifth assignment of error is overruled.

For the foregoing reasons, appellant's assignments of error are overruled, and the judgment is affirmed.

*Judgment affirmed.*

BOWMAN and PEGGY BRYANT, JJ., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, sitting by assignment.