**Keith Lamont SMITH, Petitioner,**

v.

**Cheryl PLILER, Warden, Respondent.**

**No. C 01–4185 VRW.**

United States District Court,
N.D. California.

Aug. 28, 2003.

David McNeil Morse, San Francisco, CA, for Petitioner.

Catherine A. Rivlin, Michael E. Banister, CA State Attorney General's Office, San Francisco, CA, for Respondent.

## ORDER.

WALKER, District Judge.

Petitioner Keith Lamont Smith seeks a writ of habeas corpus under 28 USC § 2254. Smith claims that "the trial court erroneously allowed the jury to consider as evidence of guilt numerous unsworn hearsay statements allegedly made by the [murder] victim." Doc. # 1 at 3. Smith also contends that he received ineffective assistance of counsel because his trial attorney "failed to object to hearsay statements * * * that were introduced against petitioner in violation of his right to confrontation under the federal constitution." Id. For the reasons set forth below, Smith's petition for writ of habeas corpus (Doc. # 1) is DENIED.

### I

On April 29, 1996, a jury found Smith guilty of murdering Michael Hadden, a violation of California Penal Code § 187. Doc. # 15, Exh. C at 3089–90. The jury also found that during the murder, Smith was armed with a handgun, acted as one of the principals in the offense and knew that one of the other principals was also armed. Id. at 3090. Finally, the jury found that "during the commission and attempted commission of the above offense, [Smith]

committed the above offense for the benefit of, at the direction of and in association with a criminal street gang with the specific intent to promote, further an[d] assist criminal conduct by gang members." *Id.*

After several enhancements, including one based on a prior conviction for a serious felony, Smith was sentenced to sixty years to life in prison without the possibility of parole. Doc. # 15, Exh. B at 101–05. Smith's co-defendant, Leroy Coleman, was also convicted in connection with Hadden's murder and was sentenced to 200 years to life in prison. *People v. Coleman,* slip op at 24 (Cal. Ct. App. Feb. 5, 1998) (Doc. # 15, Exh. G).

On February 5, 1998, the state court of appeal affirmed Smith's conviction. *Id.* at 1. Smith's petition for direct review was denied by the California Supreme Court on April 30, 1998. Doc. # 15, Exh. I.

On April 23, 1999, Smith filed a petition for a writ of habeas corpus with the California Supreme Court. See Doc. # 15, Exh. K and L. The petition was denied on May 12, 1999. See Doc. # 15, Exh. K and N.

On July 27, 2000, Smith filed the instant petition for a writ of habeas corpus under 28 USC § 2254. Doc. # 1. Respondent filed its response on July 10, 2002. Doc. # 13–15. On October 9, 2002, Smith filed a traverse. Doc. # 22.

## II

The court of appeal summarized the facts of the case as follows:

A *Discovery of the Bodies*

On April 29, 1994, * * * [police officers] found the body of a man, later identified as 34–year–old Michael Hadden, lying on his back with a large pool of blood under his head. Paramedics were unable to resuscitate him and he was declared dead.

\* \* \* \* \* \*

[On that same evening], two California Highway Patrol officers stopped to investigate [an abandoned] Hyundai. Its engine was running and the keys were in the ignition. A male, later identified as 17–year–old Dwayne Forsen, was lying dead in the passenger seat, slumped over toward the driver's seat. * * * A document in the glove box indicated that the car had been rented to Michael Hadden on April 27.

\* \* \* \* \* \*

B *Michael Hadden and the 415*

According to prosecution witness David Miranda, a correctional officer at San Quentin State Prison assigned to the security investigations unit, the 415 was founded at Folsom State Prison sometime in 1984 by Leonard Fulgham, also known as Mousy Brown. * * * Miranda interpreted letters sent from Fulgham in Prison to appellant Keith Smith as giving the latter total control of the Oakland area under the 415 organization, including narcotics trafficking and other criminal activity.

Lloyd Hadden, Jr (Lloyd), Michael Hadden's older brother, was sentenced to prison in 1993. * * * Smith was in charge of the 415 at the prison, and Lloyd became a member. According to Lloyd, "You couldn't do nothing in Solano without Keith's authority."

\* \* \* \* \* \*

About two weeks after Smith was released, Lloyd telephoned him from prison to see whether he had started taking back the territory again for 415. When Smith complained that no one would front him any money or give him any dope, Lloyd suggested his brother Michael as a money source. Lloyd explained that although Michael Hadden had never been to jail, he was an opportunist who liked to make loans and be

paid back double. Lloyd asked Michael to help Smith, and Michael said he could probably get "ten" for Smith, which meant $10,000.

Felicia Hadden was Michael Hadden's wife. Shortly before he was killed, he told Felicia they were "financially in a bind" and directed her not to use any of their credit cards. Curious, she called the credit card companies and learned that he had taken cash advances totaling about $12,000 on the two cards. Hadden then told her he had to give the money to Smith; he said he had to do whatever he told him to until his brother Lloyd got out of jail.

Felicia said she was not familiar with the 415. However, she acknowledged that before his death, Hadden had asked her to type and make copies of some written material he had prepared concerning 415, including by-laws and flow charts of its chain of command. Michael told her the papers were for Smith. Felicia spoke to her husband on the telephone in the afternoon on the day he was killed. He had taken that day off from work, and he told her he had to go open up a business for Smith. He said he had to meet with Smith and some guys that night.

Dwayne Forsen had been living with the Haddens for about a month before he and Hadden were killed. Felicia said that Hadden was like a father to Forsen.

C *Testimony by Marvin "Tiny" Jones*

Marvin "Tiny" Jones became a member of 415 in 1993 while he was serving time at the Vacaville penitentiary.

\*      \*      \*      \*      \*      \*

In February 1994, Jones began attending Saturday 415 meetings in Oakland that were organized by Smith and attended by 20 or 30 people. On Wednesdays smaller meetings were held of "the circle," those higher up in 415. Smith, also known as "Hot Lips," was the "ov-erseer" and had the most authority. Immediately below Smith in rank was Hall, the "captain." Devon "Joker" Hawkins was junior commander, Jones himself was the lieutenant, appellant Coleman was the sergeant at arms, and Charles "Bam–Bam" Woods, the minister of education.

On Friday afternoon, April 29, Hawkins informed Jones that there was a meeting at the schoolyard across from the cemetery. Jones arrived sometime after 5 p.m. Michael Hadden, Hall, Woods, Smith, and Coleman were already there, talking.

\*      \*      \*      \*      \*      \*

Smith told them to meet him on Sunnyside, and he and Hall got into Hall's car. Coleman and Hadden got into the latter's Thunderbird. Hawkins, Woods, and Jones got into Woods's car, which was parked behind the Thunderbird. As Jones watched, Coleman reached over toward Hadden's face and shot at him. Hadden jumped from the car and ran across the street toward the cemetery; Coleman ran after him, a .357 in his hand. Coleman followed Hadden into the cemetery and shot him. \* \* \* Coleman got into Woods's car and they drove to Sunnyside and 92nd Streets. Hall and Smith were already there.

Forsen, whose nickname was "White Lightning," arrived in another rental car. He asked where Hadden was. Jones said he didn't know and no one else responded. Jones believed Forsen was going to be killed because he was asking questions about Hadden. Forsen agreed to take Jones to San Francisco, and Jones got into the driver's seat of Forsen's car \* \* \* [and Coleman got in the back seat].

Just before they drove onto the freeway, Coleman shot Forsen once. \* \* \* Woods drove up and parked behind the

Hyundai; Hawkins was with him. Jones and Coleman got into Woods's car.

\*   \*   \*   \*   \*   \*

On Saturday, April 30, there was a 415 meeting at Arroyo Park. At some point Smith asked where Hadden and Forsen were. He said, "They better have a good reason not to show up." Smith also pulled Jones and Coleman aside, gave them each $200, and said it was "for what happened yesterday." He said they would get the rest later. Jones believed Smith was referring to the murders of Hadden and Forsen.

Jones said that as the overseer, Smith was the only person with authority to call a 415 meeting. Smith also was the only person with authority to order someone killed on the streets. One of the rules of 415 was "First man to lie first man to die." The punishment in 415 for treason or deception was death. Jones acknowledged that he had also been charged with murder based on Hadden's killing and that his trial was upcoming.

D   *Testimony by Charles "Bam–Bam" Woods*

Charles "Bam–Bam" Woods became a 415 member while in Solano State Prison, where he met Smith. Smith was "running everything" in the segregation wing. Several months after Woods was released from prison in 1993, he began attending 415 meetings in Oakland, which were organized by Smith, the overseer.

\*   \*   \*   \*   \*   \*

Woods said that he and Hadden became very good friends, and Hadden told him he had loaned money to Smith. When Woods's car broke down, Hadden rented a car for him and Forsen to share; Hadden also rented a second car, a Hyundai, for his wife.

On the evening of April 29, Hawkins called Woods and told him to be at a meeting that night. Woods drove to the meeting in the rental car. At the meeting * * * Hall approached Woods and said, "We're about to smoke that fool, Mike." Woods thought Hall meant they were about to kill Hadden. Woods replied only, "Yeah, is that right?" He didn't know what to think; he wondered why they were trying to kill his partner Mike. * * * When the meeting broke up, Smith directed Coleman to get into Hadden's car and told Jones to get into Woods's car with Hawkins.

\*   \*   \*   \*   \*   \*

Woods, now in his car, saw Hadden exit his car and run across the street to the cemetery. * * * Hadden collapsed [and] Coleman ran across the street, stood over Hadden's body, and fired into his head, three or four times.

\*   \*   \*   \*   \*   \*

They drove to Sunnyside, between 92nd and 94th, where Smith had told them to go [and] * * * arrived [there] at about the same time as Smith and Hall. Forsen arrived in the white Hyundai and asked about Hadden. Smith told Jones and Coleman to get into the car with Forsen and told Woods to follow them. Woods heard Smith telling Coleman that he would pay him the rest of the money tomorrow.

Coleman, Jones, and Forsen left in the Hyundai. * * * Woods followed the Hyundai to the freeway. Suddenly he saw its passenger window shatter; some of the glass hit his front windshield. Woods followed the Hyundai onto the freeway, where it stopped. Woods pulled up behind it.

Jones got out of the car, his shirt drenched in blood. * * * Coleman and Jones got into Woods's car, laughing

about how blood was coming out of Forsen's head. Woods was praying for his life, thinking that they were going to shoot him.

\* \* \* \* \* \*

At the regular Saturday morning meeting on April 30, Smith called the meeting to order and then asked where Hadden and Forsen were. He said that they better be dead or in the hospital for them to be missing the meeting. Smith and the others laughed, a "little sneaky laugh."

*Coleman,* slip op at 2–8 (Cal. Ct. App. Feb 5, 1998) (Doc. # 15, Exh. G). The court also addressed testimony given by Hadden's wife, Felicia Hadden (Felicia), his father, Lloyd Hadden, Sr, and Charles Woods concerning Hadden's fear of Smith:

Lloyd Hadden, Sr, testified that about a week before [Hadden's] death, [Hadden] said that if anything happened to him, Keith Smith would be responsible and that Smith had been threatening him. Felicia Hadden testified that when she asked about the cash advances, [Hadden] said he had to give the money to Keith Smith. She also said that when Michael had her type the 415 documents, he told her he was doing it for Keith Smith. Charles Woods testified that two weeks before Hadden was killed, [Hadden] said that Keith Smith wanted to discipline him for telling the girlfriend of a 415 member to "put a restraining order" on that member.

*Id.* at 8–9.

## III

Smith claims "that he was denied his rights under the Fifth, Sixth and Fourteenth Amendments of the federal Constitution when the trial court erroneously allowed the jury to consider" hearsay statements allegedly made by murder victim, Michael Hadden. Doc. # 22 at 2. Smith also contends that he received inef-

fective assistance of counsel because his attorney, Walter Riley, failed to object to some of the hearsay statements attributed to Hadden. *Id.*

### A

Smith's first claim is that "the trial court erroneously allowed the jury to consider as evidence of guilt numerous unsworn hearsay statements allegedly made by [Hadden] concerning threats allegedly made to Hadden by petitioner, and Hadden's claimed fear of petitioner." Doc. # 1 at 3.

After examining this same issue, the court of appeal held that:

even if [evidence regarding Hadden's statements about Smith] was erroneously admitted over appellant's objection, reversal is not required. The testimony of Jones and Woods and Lloyd Hadden, Jr, and the nonhearsay testimony of Felicia Hadden all strongly supported the jury's determination that Smith ordered Coleman to kill Hadden. Moreover, some of the evidence about Hadden's fear of Smith was admitted without objection. For instance, Felicia testified without objection that on the day he was killed, Hadden told her he had to do whatever Smith said until his brother Lloyd got out of jail. During redirect examination, she testified without objection that Michael told her he had opened a business for Smith and had to do whatever he was told. When she asked if he gave the cash advances to Smith, Michael reiterated to her "that his life was, you know, threatened. And that if he didn't, that he would kill him." Michael told her that was just the risk he had to take. There was no objection to this testimony. Furthermore, appellant Smith and codefendant Coleman were allowed to elicit evidence of other people whom Hadden also feared, thereby offsetting to some extent the evidence

about Hadden's fear of Smith. After reviewing all the evidence at this trial, we conclude that any error in admitting the testimony was harmless.

*Coleman,* slip op at 10–11.

A federal habeas court "cannot review questions of state evidence law" and may only consider "whether the petitioner's conviction violated constitutional norms." *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir.1999). A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d).

In addition to proving constitutional error, a petitioner is "entitled to habeas relief only if it can be established that the alleged trial error had a substantial and injurious effect or influence on the jury's verdict." *Mancuso v. Olivarez,* 292 F.3d 939, 949 (9th Cir.), amending and superseding 282 F.3d 728 (9th Cir.2002). In examining whether a confrontation clause error was harmless, there are several relevant factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); see also *United States v. Peterson,* 140 F.3d 819, 822 (9th Cir.1998). The Ninth

Circuit has also explained that in reviewing confrontation clause violations, "harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury assessment unaltered, had there been confrontation. * * * [H]armlessness must therefore be determined on the remaining evidence." *Christian v. Rhode,* 41 F.3d 461, 468 (9th Cir.1994) (quoting *Coy v. Iowa,* 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)).

In its response to Smith's habeas petition, respondent does not contest that Smith's constitutional rights were violated by the admission of statements attributed to Hadden regarding his fear of Smith. See generally Doc. # 14. Rather, respondent contends that the admission of these statements was harmless error. *Id.* at 8–33. Accordingly, the court examines only whether the admission of this hearsay evidence had a substantial and injurious effect on the jury's verdict. See *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

The importance of the hearsay evidence to the prosecution's case is the first factor relevant to determining whether a confrontation clause error was harmless. Respondent contends that testimony concerning Hadden's fear of Smith "was not material to any critical part of the prosecution's case." Doc. # 14 at 33. In support of this claim, respondent notes that in the prosecution's lengthy closing argument (Doc. # 15, Exh. C at 2756–96, 2828–53, 2981–3016), the "only mention of [Hadden's] fear cited by petitioner is at RT 2784." Doc. # 14 at 35. Smith responds by saying that although the hearsay evidence was not frequently mentioned, the prosecutor used the evidence "to fill an obvious hole in his case." Doc. # 22 at 9. Quoting an edited passage from the above-mentioned section of the prosecutor's closing statement, Smith argues that the prosecutor's state-

ments during closing argument actually confirm how important the hearsay evidence was to the prosecutor's case. *Id.*

An examination of the transcript supports respondent's position. Before mentioning the hearsay evidence, the prosecutor stated, "[w]e don't have to prove motive," but that the evidence mentioned, including the hearsay evidence, simply corroborated the conspiracy to murder theory under which Smith was convicted. Doc. # 15, Exh. C at 2784. Also notable is the fact that the prosecutor presented significant evidence other than the hearsay testimony to corroborate the prosecution's conspiracy theory. This evidence included: (1) testimony by the Hadden's brother that Hadden had loaned Smith a large amount of money, (2) testimony by Beverly Hadden that Smith was not present at Hadden's funeral, (3) a letter used to show that Hadden was intimidated by Smith, and (4) various documents regarding the bylaws and command structure of the 415 gang. *Id.* at 2784–85. Indeed, the hearsay evidence was used only as one of several pieces of evidence corroborating Smith's motive. Thus, in the absence of other reasons to believe that the prosecution placed special emphasis on the hearsay evidence, the court finds that this evidence was not an important part of the prosecution's case.

The second relevant factor is whether the hearsay testimony was cumulative. For many of the same reasons as discussed above, the hearsay testimony regarding Hadden's fear of Smith was in fact cumulative because it was used as only one of several pieces of evidence corroborating the prosecution's theory that Smith conspired to kill Hadden.

A third factor relevant to whether the hearsay testimony was harmless involves the presence or absence of evidence corroborating or contradicting the testimony at issue. Here, other evidence showing that Hadden had reason to fear Smith was presented to the jury. First, Lloyd Hadden, Jr testified that Hadden loaned a large sum of money to Smith. Doc. # 15, Exh. C at 1993. Lloyd Jr also testified that Smith refused to acknowledge that he ever owed Michael Hadden any money. See *id.* at 1194. From that evidence alone, one could conclude that there was likely tension between Hadden and Smith. In addition, Jones' nonhearsay testimony indicated that Smith was the only one in the gang with the authority to order someone killed. See *Coleman,* slip op at 3, 6. In a letter to Smith, Hadden stated, "You rose to the top of the dope game and brothers feared you." Doc. # 14 at 29. Considering the circumstances and Smith's position in the gang, it was not unreasonable for the jury to find that Hadden also shared this fear, thereby corroborating the hearsay testimony given by Felicia and Lloyd Sr.

The extent of cross-examination otherwise permitted is the fourth factor relevant to whether admitting the hearsay evidence was harmless error. Here, respondent correctly points out that both Lloyd Sr and Felicia were subjected to vigorous cross-examination regarding Hadden's fear of individuals other than Smith. Doc. # 14 at 33–35. The court of appeal also noted that "Smith and codefendant Coleman were allowed to elicit evidence of other people whom Hadden also feared, thereby offsetting, to some extent, the [hearsay] evidence about Hadden's fear of Smith." *Coleman,* slip op at 11. Although Hadden's fear of these other individuals and his fear of Smith are not mutually exclusive, this questioning did allow Smith the opportunity to undercut the importance of the hearsay testimony.

The final factor in evaluating whether the hearsay evidence was harmless is the overall strength of the prosecution's case.

Here, it is critical to examine the importance that the jury likely placed on the testimony of Jones and Woods. With respect to this factor, Smith insists that:

Outside of the hearsay statements of Michael Hadden, the prosecution's case relied heavily upon the self-serving and inconsistent testimony of Jones and Woods, two gang members involved in the double murder case who were trying desperately to save their own skins. Their testimony was riddled with lies and motives to fabricate, and both were made to look completely untrustworthy through cross-examination. The testimony of Jones was best encapsulated by his own words on the stand: "What's the truth?" (RT 669.) Woods showed a similar lack of concern for the truth when he was confronted with one of his numerous lies, and stated: "I was just saying that to get them locked up," and subsequently admitted putting words in the defendants' mouths to get them arrested. (RT 1620; 1659.) It was also Charles Woods who had his wife come in and give her eyewitness account of the incident to the police, despite the fact that she had never been at the scene. (RT 1586–1589.)

Doc. # 1 at 16–17.

In response, respondent spends considerable time trying to bolster the credibility of Woods and Jones. To that end, respondent notes that Jones "made no deal with the prosecution in exchange for his testimony." Doc. # 14 at 19; see also Doc. # 15 at 2828–29. When asked about his motive for testifying, Jones testified:

A. Because I got letters from the streets from my brothers and from peoples on the streets talking I was supposed to be getting killed when I go to the penitentiary and I said to myself: If I'm going to get killed for writing a statement when I first came to jail, I might as well get killed for a reason. Might as well testify. That's the only reason I testify.

Q. So you didn't want to go to prison and get killed?

A. I'm not tripping off getting killed; I'm saying I'm going to do it for a reason.

Doc. # 14 at 19; Doc. # 15 at 639.

Respondent also points out that Jones lost his fear of being killed when he found religion and began reading the Bible. Doc. # 14 at 19; Doc. # 15 at 640. This evidence is used to support respondent's position that Jones testified for reasons other than a desire to divert responsibility away from himself.

Woods testified that *after* telling police the facts concerning Hadden's murder, he asked for and received witness protection from the police. See Doc. # 15 at 1570–81. Respondent also points to an incident at trial during which a 415 gang member named "Monster" entered the court room in an apparent attempt to intimidate Woods while he was testifying. Doc. # 14 at 24. Respondent argues that Woods' fear for his life and the fact that Smith and Coleman killed his friends were his true motives for testifying, rather than merely trying to "save his skin" by escaping prosecution. See generally Doc. # 14 at 20–21.

■ "Title 28 USC § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Ortiz v. Stewart*, 149 F.3d 923, 936 (9th Cir.1998) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)). Hence, in a habeas petition, the court must "presume the correctness of credibility determinations made at the trial court level." *Id.*.

There are several conclusions that can be drawn from the dispute over the credibility of Woods and Jones. First, although some of the testimony might call into question the credibility of Woods and Jones, the prosecution was able to counter with evidence that tends to supports their credibility. For purposes of resolving the instant question, the fact that all of the evidence regarding Jones and Wood's credibility was before the jury is dispositive. This being the case, the court is bound to presume the correctness of the jury's credibility determinations. See *id.*.

Second, there is no reason to believe that the jury disbelieved the testimony of Woods and Jones and instead relied on hearsay evidence to convict Smith. In order for the prosecution to prove the elements of the murder charge under which Smith was convicted, the testimony of Woods, Jones, Lloyd Jr, and the evidence of the 415's command structure was critical, but the hearsay evidence regarding Hadden's fear of Smith was not. As mentioned above, the prosecution presented several pieces of evidence apart from the hearsay evidence that tended to show that Hadden had reason to fear Smith. See Doc. # 15, RT 2784–85. In addition, the hearsay evidence was used to corroborate the conspiracy to murder theory under which Smith was convicted and not as an independent ground to prove that Smith was responsible. See *id.* at 2784. Finally, Smith presented a substantial amount of evidence at trial showing that Hadden feared people other than Smith, thereby significantly diminishing the likelihood that the jury relied heavily on the hearsay testimony. See Doc. # 14 at 33–35.

Also of note is the lack of emphasis either side placed on the hearsay testimony at trial. Riley devoted a substantial portion, if not the majority, of his closing statement to criticizing Jones and Wood's credibility. See generally Doc. # 15, Exh.

C at 2882–2984. Likewise, the prosecutor did not emphasize the hearsay evidence in his closing statement. And during the brief portion of the prosecutor's closing statement when the hearsay testimony was mentioned, it was used as only one of several pieces of evidence to corroborate the prosecution's conspiracy to murder theory. See *id.* at 2784. The prosecutor also pointed out that proving motive was not even necessary to convict Smith under a the conspiracy to murder theory. *Id.*

Presuming that the credibility findings of the jury were correct, as is required on habeas review, the case against Smith was strong even without the hearsay testimony. See *Ortiz*, 149 F.3d at 936.

Having evaluated all five factors and found that each supports a determination of harmless error, the court concludes that the admission of hearsay evidence at Smith's trial did not have a substantial and injurious effect on the jury's verdict. Accordingly, Smith is not entitled to habeas relief on this claim.

**B**

Smith's second claim for relief under 28 USC § 2254 is that he received ineffective assistance of counsel. Smith bases this claim entirely on the fact that his trial attorney, Walter Riley, "failed to object to hearsay statements * * * that were introduced against petitioner in violation of his right to confrontation under the federal constitution." Doc. # 1 at 3. More specifically, Smith argues that:

> since the California Court of Appeal relied, in part, on the notion that objection to certain of the hearsay statements was waived, petitioner asserts in the alternative that, to the extent that counsel may be held to have failed to object to any statements, his failure to object denied

petitioner the effective assistance of counsel.

*Id.* at 20.

As supporting evidence, Smith offers a statement by Riley insisting that he had "no tactical reason for wanting [the hearsay] testimony to be admitted, and did not refrain from objecting in order that the testimony would be admitted." Doc. # 1, Exh. B at 2–3. Riley adds that "any failure to object was out of inadvertence." *Id.*

██ The Sixth Amendment guarantees a defendant's right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To make out a claim of ineffective assistance of counsel, it is necessary to satisfy the two-part test established by the Supreme Court in *Strickland.* See *id.* at 687, 104 S.Ct. 2052. First, the petitioner must show that counsel's performance fell below the objective standard of reasonableness demanded of attorneys in criminal cases. *Id.* at 688, 104 S.Ct. 2052. Second, the petitioner must establish that "the deficient performance prejudiced the defense" such that "counsel's errors were so serious as to deprive the defendant of a fair trial" with a reliable result. *Id.* at 687, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance in evaluating these two factors must be "highly deferential" resulting in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Here, Smith's argument rests entirely on a finding of merit to his first claim concerning the prejudicial effect of the hearsay testimony presented at trial. See Doc. # 1 at 3. Because the court has rejected this claim, Smith has failed to satisfy *Strickland*'s second prong, because if the admission of the hearsay evidence did not prejudice Smith's trial, then neither did his attorney's failure to object to the admission of such evidence.

## IV

For the reasons set forth above, Smith's petition for relief under 28 USC § 2254 (Doc. # 1) is DENIED.

The clerk is directed to terminate all pending motions and close the file.

IT IS SO ORDERED.